Michael Stein, Esq.
Nevada Bar No. 4760
Andrew Sedlock, Esq.
Nevada Bar No. 9183
SNELL & WILMER L.L.P.
3883 Howard Hughes Parkway
Suite 1100
Las Vegas, NV  89169
Telephone (702) 784-5200
Facsimile (702) 784-5200

Attorneys for Plaintiff TRAKLOC
NORTH AMERICA, LLC

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| TRAKLOC NORTH AMERICA, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>RONI DERSOVITZ, an individual, MARC BERNSTEIN, an individual, GEOFFREY DARMODY, an individual, MICHAEL ALBANO, an individual, WILL ANDREWS an individual, DOES I through X, ROE CORPORATIONS, I through X inclusive,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)  Case No.<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

        Plaintiff Trakloc North America, LLC (hereinafter referred to as "Trakloc N.A."), by its

attorneys, bring this action against Defendants Roni Dersovitz, Marc Bernstein, Geoffrey

Darmody, Michael Albano and Will Andrews for injunctive relief and damages.  As grounds

therefore, Plaintiff states as follows:

154600.3

**JURISDICTION AND VENUE**

1.    This is a civil action for (1) Trademark Infringement arising under the Trademark Act of 1936 (popularly known as the " Lanham Act"), 15 U.S.C. § 1051 *et seq.*; (2) Unfair Competition arising under the Lanham Act 15 U.S.C. § 1051 *et seq.*; (3) Unfair Competition under Nevada Common Law; (4) Deceptive Trade Practices arising under Nevada Revised Statutes 598.0195, 598.0923, and 41.600 and (5) Intentional Interference with Prospective Economic Advantage.

2.    The Court has subject matter jurisdiction under 15 U.S.C. § 1121(a), 28 U.S.C. § 1331 and 1338(a).

3.    The Court has subject matter jurisdiction over the counts alleging Unfair Competition under Nevada Common Law and Deceptive Trade Practices arising under Nevada Revised Statutes 598.0195, 598.0923, and 41.600, under the provisions of 28 U.S.C. 1338(b) and the principles of supplemental jurisdiction pursuant to 28 U.S.C. § 1367 as these claims are joined with a substantial and related claim under the Lanham Act, of 15 U.S.C. § 1051 *et seq.*

4.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) because Plaintiff's claims arose in this Judicial District.

5.    Venue is within the Southern District of the United States District Court, District of Nevada.

**NATURE OF THE ACTION**

6.    Trakloc N.A. repeats and realleges all allegations hitherto made as if fully set forth herein.

7.    This is an action for injunctive and monetary relief for acts of trademark infringement, unfair competition, and deceptive trade practices.

**PARTIES**

8.    Trakloc N.A. repeats and realleges all allegations hitherto made as if fully set forth herein.

9.    Plaintiff Trakloc N.A. is a Delaware limited liability company with its principal place of business in Newark, New Jersey.

154600.3

10.     Upon information and belief, Defendant Roni Dersovitz is a citizen and resident in the State of New Jersey.

11.     Upon information and belief, Defendant Marc Bernstein is a citizen and resident in the State of New York.

12.     Upon information and belief, Defendant Geoff Darmody is a citizen and resident of Australia.

13.     Upon information and belief, Defendant Michael Albano is a citizen and resident in the State of New York.

14.     Upon information and belief, Defendant Will Andrews is a citizen and resident of Australia.

## FACTS COMMON TO ALL COUNTS

15.     Trakloc N.A. repeats and realleges all allegations hitherto made as if fully set forth herein.

16.     Trakloc N.A. is currently the exclusive licensor of the Trakloc® interior drywall stud framing system in the United States, Mexico, Canada, and Brazil.

17.     Using a "twist and lock" process, the Trakloc system is a patented, self-locking drywall stud framing product that allows metal framers to construct walls faster and safer than using traditional drywall studs.

18.     The Trakloc system provides a significant advantage to framing contractors, who can now construct a solid metal frame quicker with less skilled labor.

19.     The Trakloc system technology was initially developed by Will Andrews and owned by Wilton PTY, Ltd., an Australian corporation.

20.     The patent and trademark rights in the Trakloc® system were originally licensed to an entity known as International Fabricated Buildings, Inc. ("IFB") pursuant to a written License Agreement, a true and accurate copy of which is attached hereto as **Exhibit 1**, and Intellectual Property and Working Agreement, a true and accurate copy of which is attached hereto as **Exhibit 2**.

21.     IFB subsequently granted an exclusive license to Trakloc International, LLC, a

154600.3

- 3 -

1  Nevada limited liability corporation, as contemplated by § 5.5 of the Intellectual Property and

2  Working Agreement. (Exhibit 2).

3        22.    A British Virgin Islands limited partnership known as Pandora Select Partners,

4  L.P., ("Pandora") took ownership of all of Trakloc International, LLC's assets, including the

5  exclusive license granted by its predecessor in interest, IFB pursuant to a written Settlement

6  Agreement and Amendment to Settlement Agreement, true and accurate copies of which are

7  attached hereto as **Exhibits 3 and 4**; Confession of Judgment, a true and accurate copy of which

8  is attached hereto as **Exhibit 5**; and Contingent License and Working Agreement, a true and

9  accurate copy of which is attached hereto as **Exhibit 6**.

10        23.    In July 2007, Trakloc N.A. entered into an Asset Purchase Agreement (the "Asset

11  Agreement") with Pandora and Trakloc Building Technology Systems, a Delaware corporation

12  wholly owned by Pandora, for the acquisition of all rights and assets owned by those entities as

13  they relate to the Trakloc® system.  A true and accurate copy of the Asset Agreement is attached

14  hereto as **Exhibit 7**.

15        24.    The Asset Agreement provides, in part, that "[u]pon the terms and subject to the

16  conditions contained in this Agreement, at the Closing Pandora shall sell, assign, transfer and

17  convey to [Trakloc N.A.], and [Trakloc N.A.] shall purchase, acquire and accept from Pandora,

18  all of Pandora's rights, title, and interest in and to … the Intellectual Property and Working

19  Agreement between WILTIN PTY LIMITED and International Buildings, Inc., predecessor in

20  interest to Trakloc International, LLC, dated January 30, 2002 (the '*IP Working Agreement*' and,

21  together with the Contingent License Agreement and the Master License Agreement, the

22  '*Pandora Assets*.'" (emphasis in original).

23        25.    Also on July 13, 2007, the parties to the Asset Purchase Agreement executed a

24  Trademark Assignment which assigned all rights in the following trademarks to Trakloc N.A.,

25  including but not limited to the following:

26            a.  U.S. Registration No. 3,117,490 for TRAKLOC

27            b.  Brazilian Application Ser. No. 827208251 for TRAKLOC

28            c.  Canadian Registration No. TMA 656,979 for TRAKLOC

154600.3

1                d.   Mexican Application Ser. No. 698550 for TRAKLOC

2                e.   U.S. Application Ser. No. 78/625,483 for TRAKLOC (& design)

3   A true and accurate copy of the executed and notarized Trademark Assignment Agreement is

4   attached hereto as **Exhibit 8** and incorporated by this reference.

5        26.     Trakloc N.A. has continually used the TRAKLOC name and mark throughout

6   North America in connection with the manufacture and distribution of the Trakloc® system.

7        27.     Trakloc N.A. is a registered exhibitor at this year's METALCON International

8   tradeshow and conference in Las Vegas, Nevada, scheduled from October 3, 2007 to October 5,

9   2007, which showcases material businesses involved with the metal construction industry.

10       28.     Trakloc N.A. expects to generate significant revenue through orders placed by

11   tradeshow attendees and through potential collaborations with other exhibitors.

12       29.     On October 1, 2007, Trakloc N.A.'s President and CEO, David Jablow, received

13   an email from Defendant Dersovitz, informing Jablow that the Defendants had formed an

14   unnamed company which purported to be the "exclusive owner of the worldwide rights to

15   Trakloc." A true and accurate copy of the October 1, 2007 email is attached hereto as **Exhibit 9**

16   and incorporated by this reference.

17       30.     The email also stated that several Defendants would attend the METALCON

18   tradeshow to represent the interests of this unnamed company, and disputed the validity of

19   Trakloc N.A.'s license.

20       31.     At present Trakloc N.A. is unaware of any plausible reasons why its license could

21   be disputed, or how Defendants can properly assert "worldwide rights" to the Trakloc® system.

22       32.     Trakloc N.A. has confirmed that several Defendants are registered attendees of the

23   upcoming METALCON tradeshow.

24       33.     Upon information and belief, Defendants intend to interfere with Trakloc N.A.'s

25   exhibition and mislead potential and current consumers and licensees as to the validity of Trakloc

26   N.A.'s license.

27       34.     By holding themselves out as the exclusive worldwide owners of the Trakloc®

28   system, Defendants are attempting to trade on the goodwill and reputation of Trakloc N.A. and its

154600.3

1    licensees.

2         35.    By using the TRAKLOC mark in connection with their business activities,

3    Defendants are attempting to create an improper association between their activities and Trakloc

4    N.A.'s trademarks.

5         36.    Upon information and belief, Defendants do not have trademark or other

6    intellectual property rights in the TRAKLOC name and mark within the U.S, Mexico, Canada, or

7    Brazil.

8         37.    Upon information and belief, Defendants has no prior use of TRAKLOC in the

9    United States, Mexico, Canada, or Brazil in connection with the bona fide offering of any goods

10   or services.

11        38.    Upon information and belief, Defendants intend to divert customers from Trakloc

12   N.A.'s exhibition at the METALCON conference in a manner that is likely to harm the goodwill

13   and reputation of Trakloc N.A.'s marks.

14                                    <u>**COUNT I**</u>

15        **Violation of the Lanham Act, 15 U.S.C. § 1114(a) – Trademark Infringement**

16        39.    Trakloc N.A. repeats and realleges all allegations hitherto made as if fully set forth

17   herein.

18        40.    Defendants have used the registered mark TRAKLOC in the United States in

19   connection with the sale, offering for sale, distribution, and/or advertising of goods and/or

20   services on or in connection with which such use has caused confusion, or mistake, or has

21   deceived and/or is likely to cause confusion, or to cause mistake, or to deceive.

22        41.    Defendants have been using the registered mark TRAKLOC in the United States

23   without Trakloc N.A.'s authorization.

24        42.    Upon information and belief, Defendants' conduct has been willful, with the intent

25   to cause confusion and deceive.

26        43.    Defendants' conduct has proximately caused damage to Trakloc N.A. in an

27   amount to be determined at trial.

28        44.    Defendants' conduct will continue to cause confusion among the general public

unless enjoined and restrained by this Court.

45.     Trakloc N.A. has suffered and will continue to suffer irreparable harm to its business reputation and goodwill unless Defendants are enjoined and restrained from using the mark TRAKLOC in its trade name, domain name, or otherwise.

46.     Trakloc N.A. has no adequate remedy at law and is entitled to injunctive relief.

## COUNT II

### Violation of the Lanham Act, 15 U.S.C. § 1125(a) – Trademark Infringement/Unfair Competition

47.     Trakloc N.A. repeats and realleges all allegations hitherto made as if fully set forth herein.

48.     Trakloc N.A. has continuously used the trade name TRAKLOC in commerce to identify its goods and services.

49.     Trakloc N.A. continuously used the mark TRAKLOC in commerce to identify the goods and services provided by Trakloc and to distinguish such goods and services from goods and services provided by others.

50.     Defendants' use of the trade name TRAKLOC in commerce on or in connection with their goods and/or services has caused confusion, or mistake, or has deceived and/or is likely to cause confusion, or to cause mistake, or to deceive.

51.     Defendants' use of the trademark TRAKLOC in commerce on or in connection with their goods and/or services has caused confusion, or mistake, or has deceived and/or is likely to cause confusion, or to cause mistake, or to deceive.

52.     Defendants have been using the name TRAKLOC and the mark TRAKLOC without Trakloc N.A.'s authorization.

53.     Upon information and belief, Defendants' conduct has been willful, with the intent to cause confusion and deceive.

54.     Defendants' conduct has proximately caused damage to Trakloc in an amount to be determined at trial.

154600.3

55.     Defendants' conduct will continue to cause confusion among the general public unless enjoined and restrained by this Court.

56.     Trakloc N.A. has suffered and will continue to suffer irreparable harm to their business reputation and goodwill unless Defendants are enjoined and restrained from using the trade name TRAKLOC in its trade name, domain name, or otherwise.

57.     Trakloc N.A. has no adequate remedy at law and is entitled to injunctive relief.

<u>**COUNT III**</u>

**Common Law Unfair Competition**

58.     Trakloc N.A. repeats and realleges all allegations hitherto made as if fully set forth herein.

59.     By virtue of their acts, Defendants have engaged in unfair competition with Trakloc, N.A..

60.     Upon information and belief, Defendants' conduct has been willful, with the intent to cause confusion and deceive.

61.     Defendants' conduct has proximately caused damage to Trakloc N.A. in an amount to be determined at trial.

62.     Defendants' conduct will continue to cause confusion among the general public and/or will continue to dilute Trakloc N.A.'s mark unless enjoined and restrained by this Court.

63.     Trakloc N.A. has suffered and will continue to suffer irreparable harm to their business reputation and goodwill and/or to the distinctive quality of its mark and/or reputation in its products and business unless Defendants are enjoined and restrained from using the trade name TRAKLOC in its trade name, domain name, or otherwise.

64.     Trakloc N.A. has no adequate remedy at law and is entitled to injunctive relief.

<u>**COUNT IV**</u>

**Violation of Nevada Revised Statutes 598.0915, 598.0923, and 41.600 - Deceptive Trade Practices**

65.     Trakloc N.A. repeats and realleges all allegations hitherto made as if fully set forth herein.

154600.3

- 8 -

66. By virtue of their conduct, Defendants have violated Nevada Revised Statutes 598.0915(4) and (5), 598.0923(3), and 41.600(2)(e).

67. Defendants' conduct has proximately caused damage to Plaintiffs in an amount to be determined at trial.

68. Defendants' conduct will continue to cause confusion among the general public unless enjoined and restrained by this Court.

69. Trakloc N.A. has suffered and will continue to suffer irreparable harm to their business reputation and goodwill unless Defendants are enjoined and restrained from using the trade name TRAKLOC in its trade name, domain name, or otherwise.

70. Trakloc N.A. has no adequate remedy at law and is entitled to injunctive relief.

## COUNT V

### Intentional Interference with Prospective Economic Advantage

71. Trakloc N.A. repeats and realleges all allegations hitherto made as if fully set forth herein.

72. Upon information and belief, at the time Defendants adopted and began using the TRAKLOC name and mark and since that time, Defendants knew and have known that Trakloc N.A. is in the business of providing the Trakloc® system in the U.S., Canada, Mexico, and Brazil.

73. Upon information and belief, Defendants committed acts intended or designed to disrupt Trakloc N.A.'s prospective economic advantage arising from advertising and/or providing these services.

74. Defendants' actions have disrupted or are intended to disrupt Trakloc N.A.'s business, by, among other things, diverting potential and current customers away from Trakloc N.A.'s exhibition booth at the METALCON conference.

75. Defendants have no legal right, privilege or justification for their conduct.

76. As a direct and proximate result of Defendants' intentional interference with Trakloc N.A.'s prospective economic advantage, Trakloc N.A. has suffered, and will continue to suffer, monetary damages and irreparable injury.

1    **WHEREFORE**, Trakloc N.A. respectfully prays for judgment in its favor and against

2    Defendants on all counts of Trakloc N.A.'s Complaint and for an order as follows:

3    A.    Permanently enjoining Defendants and any affiliated company and its officers,

4    agents, servants, employees, attorneys, and those persons, firms, or corporations acting in concert

5    and participation with it from using the name TRAKLOC in its trade name or domain name.

6    B.    Awarding Trakloc N.A. monetary damages in an amount to be determined at trial;

7    C.    Awarding Trakloc N.A. treble damages and/or punitive damages in an amount to

8    be determined at trial;

9    D.    Awarding Trakloc N.A. statutory damages in the amount to be determined by the

10   Court;

11   E.    Awarding Trakloc N.A. its attorney's fees, equitable pre-judgment interest at a rate

12   the Court deems just, and costs of suit; and

13   F.    Awarding such other and further relief as the Court may deem just and proper,

14   including all relief to which Trakloc N.A. is entitled under Federal and State law.

15   <u>**DEMAND FOR JURY TRIAL**</u>

16   Pursuant to Fed. R. Civ. P. 38, Plaintiffs demand trial by jury in this action as to the issue

17   of damages.

18   Dated: October 3rd , 2007

19   
20                    SNELL & WILMER L.L.P.

21   By:_____

22                    Michael Stein, Bar No. 4760
                     Andrew Sedlock, Bar No. 9183
23                    3883 Howard Hughes Parkway
                     Suite 1100
24                    Las Vegas, NV 89169

25                    *Attorneys for Plaintiff Trakloc North*
                     *America, LLC.*
26   
27   
28   

154600.3
- 10 -

# EXHIBIT 1

## LICENSE AGREEMENT

This License Agreement (this "Agreement") is entered into as of the _30_<sup>TH</sup> day of January, 2002 (the "Effective Date") by and between WILTIN PTY LIMITED, an Australian company (ACN 061 777 046), referred to herein as "Licensor", on the one hand, and International Fabricated Buildings, Inc., a Nevada corporation, referred to herein as "Licensee", on the other hand. Licensor and Licensee are collectively referred to herein as "the parties" and individually referred to herein as "a party". This Agreement is made by the parties with respect to the facts set forth in the following Recitals:

## RECITALS

A.  Licensor has developed, designed and currently licenses the manufacturing of a new self-locking stud, track and header partitioning system, known as the "Trakloc system" (the "System"). The System features innovations that include floor and ceiling track with a continuous twin "v" groove system which allows infinite positioning and fastening of a quick fitting stud. The stud has telescoping capabilities to overcome ceiling to floor height variations.

B.  Licensor currently holds patents pending for the System (identified as PQ02521 and PCT/AU00/00500 and collectively referred to herein as the "Patents," copies of which Patents are attached hereto as Exhibit A and incorporated herein by this reference), and holds any and all rights in and with respect to any patents, including but not limited to the Patents, copyrights, Confidential Information, know-how, trade secrets, moral rights, contract or licensing rights, confidential and proprietary information protected under contract or otherwise under law, and other similar rights or interests in intellectual property relating to the System and any derivatives of the System ("Proprietary Rights").

C.  Licensor has the right to grant an exclusive license to Licensee to manufacture, market, sell and distribute the System in the United States, Canada, Mexico and Brasil, and is willing to do so on the terms and conditions of this Agreement, and Licensee desires to receive such exclusive license on the terms and conditions contained herein.

D.  Licensee is willing to provide Licensor with background information about its sublicensees at the time sublicenses are executed, as well as quarterly written reports describing the status of all work-in-process by the Licensee and such sublicensees.

## AGREEMENT

NOW, THEREFORE, in consideration of the Recitals and the mutual covenants and conditions contained herein, the receipt and sufficiency of which are hereby expressly acknowledged, the parties hereby agree as follows:

1.  **Definitions.** Unless a contrary interpretation is required by the specific context, the following terms shall have the following definitions, whether used in the singular, plural, possessive or other such form:

1.1    "Effective Date" shall mean the date of execution of this Agreement by both parties, as specified in the preamble above.

1.2    "Indemnify" shall mean to fully defend and indemnify the designated party to be indemnified, its officers, directors, employees, agents and other representatives, and to pay any and all liabilities, losses and damages (including awards of court costs and attorneys' fees) resulting from the subject claim.

1.3    "License" shall mean the exclusive license granted under this Agreement by Licensor to Licensee for manufacturing, marketing, sale and distribution of the System in the Territory for the Term.

1.4    "Licensed Product" shall mean the System, together with all associated plans, specifications, fixes, updates, enhancements, upgrades and Proprietary Rights, as defined in Recital B.

1.5    "Name" shall mean "Trakloc."

1.6    "Patent Documentation" shall mean all documentation relating to the Patents for the System, the final Patent(s) for the System, and all pending and future applications to patent the System, wherever and whenever filed or located.

1.7    "Patents" shall have the meaning set forth in Recital B.

1.8    "Performance Standard" shall have the meaning set forth in section 8.1 of this Agreement.

1.9    "Proprietary Rights" shall have the meaning set forth in Recital B.

1.10   "System" shall have the meaning set forth in Recital A.

1.11   "Term" shall mean the term of this Agreement, as set forth is Section 8 hereof.

1.12   "Territory" shall mean the United States, Canada, Mexico and Brasil.

2.    License and Restrictions

2.1    Grant of License.   Subject to the limitations and restrictions provided in this Section 2 and subject to the other terms and conditions of this Agreement, Licensor hereby grants, and Licensee hereby accepts, the exclusive right and License during the Term and in the Territory:

2.1.1   to market, sell, distribute and manufacture the System; and

2.1.2   to use the Name and to file a fictitious business name statement to use the Name, and/or to use the Name in its entity name; and

2.



**2.1.3**   to use the Proprietary Rights and the Patent Documentation.

All rights that are not expressly granted to Licensee herein are retained by Licensor.

3.      **Licensor's Development and Support Responsibilities**

**3.1     Marketing and Distribution.**  Licensor shall, at its expense, unless otherwise provided:

**3.1.1**   Refer to Licensee all leads, inquiries or potential orders, existing or arising in the future, for the sale of Systems to buyers headquartered in the Territory or to be installed in projects located in the Territory, and provide to Licensee all information relating to such leads, inquiries or potential orders when and as received by Licensor.

**3.1.2**   Licensor shall cooperate with Licensee's efforts to market the System in the Territory and shall provide marketing support relating thereto to Licensee from time to time as agreed upon by the parties, including but not limited to the possible participation by Licensor at trade shows, which participation shall be at Licensee's specific request, with any expenses relating thereto to be paid as agreed upon by both parties.

**3.1.3**   Provide to Licensee, copies of all marketing information, brochures, advertisements and similar information used by Licensor outside the Territory to market the Systems.

**3.1.4**   Maintain the patent pending and then the patent in good standing in Australia and the Territory, and in compliance with all laws and regulatory requirements. Licensor together with the Licensee shall continue to pursue with all due diligence the completion of the process to patent the System so that it is protected in the Territory and to protect the Proprietary Rights from any infringement in the Territory.   Complete copies of all Patent Documentation, information, applications, amendments, supplements, notices and other communications relating to the perfection of the patent rights shall be provided to Licensee as of the Effective Date and thereafter when received by Licensor, and the parties shall cooperate in good faith with each other's efforts to protect the System and the Propriety Rights in the Territory. The cost of maintaining the patent pending and then the patent, with the regulatory authorities will be the attributed to the Licensee.

**3.2     Manufacturing.** Licensor shall, at its expense, unless otherwise provided:

**3.2.1**   Provide to Licensee all plans, specifications, instructions, drawings and other information required by Licensee to manufacture the Systems in the Territory, including all enhancements and improvements thereto if and when developed by Licensor.

**3.2.2**   Cooperate with the efforts of Licensee to arrange at Licensee's expense for product liability insurance policies, to protect Licensee and its sublicensees (not Licensor) from any design defects in the System.  Such policies shall be placed by Licensee with such insurers

and shall having such coverage amounts as may be selected from time to time by the Licensee in its sole and absolute discretion.

**3.3     Standard of Performance.**  Licensor shall use reasonable commercial efforts to perform the responsibilities described in Sections 3.1 and 3.2 above.

**3.4     Expenses.**  Licensee shall have no responsibility or liability for any of Licensor's expenses hereunder.

**4.     Licensee's Development and Support Responsibilities**

**4.1     Marketing and Distribution.**  Licensee shall, at its expense, unless otherwise provided:

**4.1.1**   Diligently market and promote the sale of the Systems in the Territory; use commercially reasonable efforts to attempt to increase the volume of sales annually, and to develop and exploit the market for the Systems in the Territory.  For such promotion of sales, Licensee shall use all methods normally employed by exclusive licensees and/or distributors or other sellers of similar products in the Territory.  Licensee shall publish and distribute, at its own expense, all necessary advertising and promotional material.  In connection therewith, the parties acknowledge and agree that Licensee shall be authorized to use the Name, and that no advertising or promotional material, including any such material which includes the Name, must first be disclosed to, or reviewed or approved by Licensor.

**4.2     Manufacturing.**  The parties acknowledge that it is Licensee's present intention to sublicense all manufacturing hereunder.  Licensee shall cause its sublicensed manufacturers to:

**4.2.1**   Exercise reasonable care in the manufacturing of Systems, with specific adherence to all plans, specifications, instructions, drawings and other information supplied by Licensor to Licensee for manufacturing the Systems.

**4.2.2**   Manufacture the Systems in a fit, merchantable, workmanlike and marketable manner that meets all industry standards.

**4.2.3**   Protect Licensor, under liability insurance policies with insurers and coverage reasonably acceptable to Licensor, from any negligence in the manufacturing of the Systems.

**4.2.4**   Provide to Licensee (which shall then provide to Licensor) written background materials and information about the business and expertise of such manufacturing sublicensees at the time contracts are executed by and between Licensee and any manufacturing sublicensees, and provide to Licensee (which shall then provide to Licensor) quarterly written reports describing the status of all work-in-process at the end of each calendar quarter during the term of such sublicensing agreement.



**4.3    Standard of Performance.** Licensee shall use reasonable commercial efforts to perform the responsibilities described in Sections 4.1 and 4.2 above.

**5.    Relationship Created**

**5.1    Independent Contractor Status.** Licensee is not a partner or joint venturer of Licensor for any purpose whatsoever, but is an independent contractor.

**5.2    Taxes, Licenses and Permits.** Licensee shall be responsible for Licensee's taxes, licenses, fees, permits or any other requirements for Licensee to act as an independent contractor.

**5.3    Expenses and Disbursements.** All expenses incurred by Licensee in connection with the performance by Licensee of Licensee's sales, marketing, distribution and manufacturing activities shall be the sole responsibility of Licensee. Licensee shall not represent to any person that Licensee has any right, power or authority to create any contract or obligation, express or implied, on behalf of or in the name of, or binding upon Licensor.

**5.4    Agents and Representatives of Licensee.** Licensee shall be solely responsible for its own risk, expense and supervision as it relates to any of its agents or representatives working under the authority of Licensee and shall not have any claim against Licensor for any compensation or reimbursement unless otherwise agreed to in writing between the parties.

**6.    Protection of Proprietary Rights**

Licensee shall receive and maintain in confidence all Proprietary Rights and Patent Documentation of Licensor. In addition, all books, documents, records and other material and information made known to the parties pursuant to this Agreement are hereby designated as confidential and shall be returned upon the termination of this Agreement within 10 days of request for material. This provision shall survive the termination of this Agreement for a 10-year period from the date of termination.

**6.1    No Requirements as to Sales Price.** Nothing contained herein shall restrict in any way Licensee's right, in its sole and absolute discretion, to establish the price which it elects from time to time to charge for the sale of the System to buyers.

**7.    [intentionally omitted]**

**8.    Term and Performance Standard**

**8.1    Performance Standard.** During the Term of this Agreement, Licensee shall use its commercially reasonable efforts to sell as many Systems in the Territory as possible, and will use such efforts to attempt to increase such sales annually (the "Performance Standard").

**8.2    Term.**  The term of this Agreement (the "Term") shall begin on the first day of the first full month following the date of this Agreement and shall continue for twenty-eight (28) years thereafter; provided, however, that if the statutory limit of any Patent shall expire in any part of the Territory prior to the expiration of such 28-year Term, then this Agreement shall be subject to termination by Licensor prior to such 28-year Term, ONLY as to such Patent in such part of the Territory, by giving written notice of termination to Licensee within ninety (90) days after the expiration of such Patent.    If Licensor fails to terminate this Agreement, notwithstanding its right to do so, within such time requirement, the Agreement shall continue as if no termination had occurred.    Notwithstanding the foregoing, this Agreement may be terminated in writing in accordance with any of the provisions noted in Section 8.3 below.  The parties agree to review the status of the Patents, Licenses and Sub-licenses at each (twenty-four) 24 month period during the term of the agreement.

**8.3    For Cause Termination**

**8.3.1**   Commission of a felony by Licensee, or any plea of nolo-contendere to a felony charge, in the course of performance or Term of this Agreement shall automatically terminate this Agreement with no written notification required.

**8.3.2**   In the event of the filing by or against Licensee of a Chapter 7 bankruptcy liquidation proceeding, whether voluntary or involuntary, which is finalized by court action, Licensor may, in addition to any other right or remedy provided by this Agreement or by law, terminate all or any part of this Agreement without any liability to Licensee or any other person or entity on account thereof.

**8.3.3**   The breach by Licensee of any provision hereof other than Sections 8.1 or 8.2 above, shall entitle Licensor to terminate this Agreement after (a) written notice is provided to Licensee specifically describing the breach, and (b) Licensee fails to cure such breach within 30 days after receipt of such notice; provided, however, that if such breach cannot reasonably be cured within such 30-day period, then such breach shall be deemed cured if Licensee commences the actions necessary to cure such breach within such 30-day period and thereafter continues and completes such cure in as timely a manner as possible.

**8.4    Without Cause Termination**

This Agreement may be terminated at any time upon the mutual agreement of the parties.

**9.    Indemnification**

Each party shall Indemnify and hold harmless the other party from and against any liability, costs or expenses arising out of the indemnifying party's breach of this Agreement and failure to timely cure such breach as provided herein.

**10.    Attorney's Fees**

If any legal action is brought to enforce the terms of this Agreement, or brought pursuant to a dispute arising out of such terms, the successful or prevailing party shall be entitled to recover all reasonable fees and costs incurred in such action or proceeding, including but not limited to attorney's fees, in addition to any other relief to which it may be entitled.

## 11.   Invalidity of Provisions

Any provision of this Agreement which is invalid or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

## 12.   Counterpart Agreements

This Agreement may be executed in any number of counterparts, and each counterpart shall constitute an original instrument, but all such separate counterparts shall constitute only one and the same instrument.

## 13.   Governing Law

This Agreement is made in, governed by and shall be construed solely in accordance with, the internal laws of the State of California, and no conflicts of laws or provisions therein shall apply.

## 14.   Authority

Both parties represent and warrant to each other that they have the right and lawful authority to enter into this Agreement for the purpose herein and there are not other outstanding agreements or obligations inconsistent with the terms and provisions hereof.

## 15.   Notices

15.1   Air Courier.  Any notice, demand or request required or permitted to be given hereunder shall be in writing and shall be deemed effective three (3) business days after having been deposited with an international air courier for next business day delivery, or if next business day delivery is not available, then for delivery as soon as possible by such courier, addressed to the addressee at its main office, as set forth in the addressee's last communication to the other party.

15.2   Change in Address.  Either party may change its address for purposes of this Agreement by written notice to the other party given in accordance with this Agreement.

## 16.   Successors and Assigns

7

Licensee shall be entitled to assign or sublicense all or any part of its rights and obligations under this Agreement to one or more persons or entities of its choosing, in its sole and absolute discretion; provided, however, that no such assignment of rights, delegation of duties or sublicense hereunder shall release Licensee from liability hereunder. The parties specifically agree and acknowledge that this Agreement shall survive and shall be binding upon any purchaser or assignee of Licensor or the Proprietary Rights. Subject to the foregoing, the successors and assigns of the parties shall inure to the benefit of, and shall be bound by, the terms of this Agreement.

## 17.   No Permits Required

Licensor represents and warrants that no permits or authorizations are required from any governmental authority to use the System in non-bearing walls in any construction in the Territory. Licensor agrees to provide Licensee with copies of all applicable supporting information on which Licensor bases its representation that no such permits or authorizations are required.

This Agreement is entered into and shall be deemed effective as of the Effective Date.

Licensor:                   WILTIN PTY LIMITED,
                            an Australian company
                            (ACN 061 777 946)

                     By:    _Susan M. Andrews_
                            Susan M. Andrews
                            Company Director

Licensee:                   International Fabricated Buildings, Inc.,
                            a Nevada corporation

                     By:    _Matthew J. Richards_
                            Matthew J. Richards
                            President

8

**EXHIBIT 2**

## INTELLECTUAL PROPERTY AND WORKING AGREEMENT

This "Agreement" is entered into as of the __30 TH__ day of January, 2002 (the "Effective Date") between WILTIN PTY LIMITED, an Australian company (ACN 061 777 946), referred to herein as "Licensor", on the one hand, and International Fabricated Buildings, Inc., a Nevada corporation, referred to herein as "Licensee", on the other hand. Licensor and Licensee are collectively referred to herein as "the parties" and individually referred to herein as "a party". This Agreement is made by the parties with respect to the facts set forth in the following Recitals:

### RECITALS

A.    Licensor has developed, designed and currently licenses the manufacturing of a new self-locking stud; track and header partitioning system, known as the "Trakloc system" (the "System"). The System features innovations that include floor and ceiling track with a continuous twin "V" groove system, which allows infinite positioning and fastening of a quick fitting stud. The stud has telescoping capabilities to overcome ceiling to floor height variations.

B.    Licensor currently holds patents pending for the System (identified as PQ02521 and PCT/AU00/00500 and collectively referred to herein as the "Patents," copies of which Patents are attached hereto as __Exhibit A__ and incorporated herein by this reference); and holds any and all rights in and with respect to any patents, including but not limited to the Patents, copyrights, Confidential Information, know-how, trade secrets, moral rights; contract or licensing rights, confidential and proprietary information protected under contract or otherwise under law, and other similar rights or interests in intellectual property relating to the System and any derivatives of the System ("Proprietary Rights").

C.    It is acknowledged by the parties that Parahelp, an Australian incorporated company ("Parahelp"), has developed the hardware, equipment and know-how necessary to produce and market the System. Parahelp is a licensee of the Licensor for the territory of Australia. The Licensor hereby undertakes to have Parahelp furnish the Licensee with all proprietary information related to the System. The Licensor will cause Parahelp to forward all the said proprietary information directly to the Licensee upon its request.

D.    Licensor hereby represents that it has the right to grant an exclusive license to Licensee to manufacture, market, sell and distribute the System in the United States, Canada, Mexico and Brasil, and has done so on the terms and conditions of the Licensing Agreement between the parties dated January 50, 2002 (the "License Agreement"). The terms and conditions of the License Agreement are incorporated herein by this reference. The Licensor has filed the appropriate patent requirements in the United States. The territories of Canada, Mexico and Brasil are also included in this exclusive right; however, the parties acknowledge that filings of patent documents in those jurisdictions has yet to be completed. The Licensee has received such exclusive license on the terms and conditions contained in the License Agreement.

E.    Licensor is willing to provide Licensee with background information about its System to substantiate its claims both herein and also in the License Agreement as well as reports describing the status of all work-in-process by the Licensor that would effect the status of the intellectual property and the System itself.

SRB01078

1.6    **"Patent Documentation"** shall mean all documentation relating to the Patents for the System, the final Patent(s) for the System, and all pending and future applications to patent the System, wherever and whenever filed or located.

1.7    **"Patents"** shall have the meaning set forth in Recital B.

1.8    **"Performance Standard"** shall have the meaning set forth in section 7.1 of this Agreement.

1.9    **"Proprietary Rights"** shall have the meaning set forth in Recital B.

1.10    **"Participation"** shall mean the funds to be paid by Licensee to Licensor, as described in Section 7 of this Agreement.

1.11    **"System"** shall have the meaning set forth in Recital A.

1.12    **"Term"** shall mean the term of this Agreement, as set out in Section 7.2 hereof.

1.13    **"Territory"** shall mean the United States, Canada, Mexico and Brasil.

## 2. Due Diligences

2.1    **Confirmations.** Subject to the limitations and restrictions provided in this Section 2 and subject to the other terms and conditions of this Agreement and the License Agreement, Licensor hereby grants, and Licensee hereby accepts, the exclusive right to investigate to the Licensee's satisfaction:

2.1.1    the validity of the Patent(s) in Australia and the Territory; and

2.1.2    the design and specifications for the tooling and machinery to produce the System ; and

2.1.3    the Proprietary Rights and the Patent Documentation as it exists; and

2.1.4    the current usage of the System in Australia, including discussions with Customers, sub-trades, contractors, developers and other users of the System; and

2.1.5    access to the technical data for the machinery, including computer data, testing and design elements; and

2.1.6    access to the technical data for the System itself, including engineering reports, design criteria, building information and the like.

2.2    **Term for Completion of Due Diligence.** The Licensor grants the Licensee a period of 90 days from the effective date and signing the Licensing Agreement; which ever is the later, to complete its Due Diligence.

SRB01080



**2.3    Fee for Intellectual Property.** If prior to the end of the term of the Due Diligence set out in Section 2.2, the Licensee has determined that the Due Diligence has been completed to its satisfaction, then the Licensee will notify the Licensor and shall thereupon pay to the Licensor the sum of US$25,000 (twenty-five thousand US dollars) for the Proprietary and Intellectual Property of the System. This sum shall be paid on behalf of the Newco and will be accepted as the first year's payment of the license fee. The payment of these funds is at the Licensee's sole discretion and is entirely dependent on its being satisfied with the investigation made in keeping with the Due Diligence described in Section 2.1.

**2.4    System Sales.** No sale of the System in any form will be undertaken until the due diligence period has been completed and the formation of the Newco has been completed

**2.5    Notification.** Prior to the end of the term noted in Section 2.2, the Licensee shall indicate in writing to the Licensor whether or not the Due Diligence has met with the Licensee's satisfaction. If the Licensee indicates its satisfaction, then the Licensee will act so that the formation of the Newco will take place within that period and be in a position to commence operations no later than the 91st day.

**2.6    Completion.** If the Licensee indicates satisfaction with the Due Diligence then the terms and conditions of this Agreement and the Licensing Agreement will be in full force. If the Licensee indicates dissatisfaction with the Due Diligence, then the parties agree that they will mutually release each other from both this Agreement and the Licensing Agreement.

**2.7    Legal costs.** Any legal costs incurred by the parties during the Due Diligence period will be the responsibility of the party incurring such expense. The parties will continue to retain independent counsel and will be responsible individually for those costs.

**3.    Licensor's Development and Support Responsibilities**
    <u>It is stipulated and agreed by the parties that beginning with this Section and continuing to the end of this Agreement, the word "Licensee" means the Newco</u>

**3.1    Marketing and Distribution.** Licensor shall, at its expense, unless otherwise provided:

**3.1.1    Refer** to Licensee all leads, inquiries or potential orders, existing or arising in the future, for the sale of Systems to buyers headquartered in the Territory or to be installed in projects located in the Territory, and provide to Licensee all information relating to such leads, inquiries or potential orders when and as received by the Licensor.

**3.1.2    Licensor** shall cooperate with Licensee's efforts to market the System in the Territory and shall provide marketing support relating thereto to Licensee from time to time as agreed upon by the parties, including but not limited to the possible participation by Licensor at trade shows, which participation shall be at Licensee's specific request, with any expenses relating thereto to be paid as agreed upon by both parties.



SRB01081

3.1.3   Provide to Licensee, copies of all marketing information, brochures, advertisements and similar information used by Licensor outside the Territory to market the Systems.

3.1.4   Maintain the patent pending and then the patent in good standing in Australia and the Territory, and in compliance with all laws and regulatory requirements.  Licensor together with the Licensee shall continue to pursue with all due diligence the completion of the process to patent the System so that it is protected in the Territory and to protect the Proprietary Rights from any infringement in the Territory.   Complete copies of all Patent Documentation, information, applications, amendments, supplements, notices and other communications relating to the perfection of the patent rights shall be provided to Licensee as of the Effective Date and thereafter when received by Licensee, and the parties shall cooperate in good faith with each other's efforts to protect the System and the Propriety Rights in the Territory.

3.1.5   The cost of maintaining the patent pending and then the patent, with the regulatory authorities, in the Territory, will be the attributed to the Licensee.

3.2   Manufacturing.  Licensor shall, at its expense, unless otherwise provided:

3.2.1   Provide to Licensee all plans, specifications, instructions, drawings and other information required by Licensee to manufacture the System in the Territory, including all enhancements and improvements thereto if and when developed by Licensor.

3.2.2   Cooperate with the efforts of Licensee to arrange at Licensee's expense for product liability insurance policies, to protect Licensee and its sublicensees (not Licensor ) from any design defects in the System.  Such policies shall be placed by Licensee with such insurers and shall have such coverage amounts as may be selected from time to time by the Licensee in its sole and absolute discretion.

3.3   Standard of Performance.  Licensor shall use reasonable commercial efforts to perform the responsibilities described in Sections 3.1 and 3.2 above.

3.4   Expenses.  Licensee shall have no responsibility or liability for any of Licensor's expenses hereunder, unless otherwise specifically noted.

3.5   Support Responsibilities.  Licensor shall, at its expense, unless otherwise provided:

3.5.1   Provide the Licensee with all the data noted in Section 2 so as to allow the Licensee to reasonably complete the Due Diligence referred to in Section 2.

3.5.2   Licensor shall cooperate with Licensee's efforts to confirm all information relating to but not limited to the information required in Section 2. Licensee from time to time as agreed upon by the parties, will deal with any extraordinary expenses relating thereto to be paid as agreed upon by both parties.

4.   Licensee's Development and Support Responsibilities

SRB01082



4.1    **Marketing and Distribution.** Licensee shall, at its expense, unless otherwise provided in this Agreement:

4.1.1    Diligently market and promote the sale of the Systems in the Territory; pay the Participation amounts described in Section 8 below; use commercially reasonable efforts to attempt to increase the volume of sales annually, and to develop and exploit the market for the Systems in the Territory.    For such promotion of sales, Licensee shall use all methods normally employed by exclusive Licensee's and/or distributors or other sellers of similar products in the Territory. Licensee shall publish and distribute, at its own expense, all necessary advertising and promotional material.  In connection therewith, the parties acknowledge and agree that Licensee shall be authorized to use the Name, and that no advertising or promotional material, including any such material which includes the Name, must first be disclosed to, or reviewed or approved by Licensor. The Licensee will make all efforts to ensure the compliance of any such materials with laws the in Territory and requirements of the authorities.

4.2    **Manufacturing.** The parties acknowledge that it is Licensee's present intention to sublicense all manufacturing hereunder. Licensee shall cause its sublicensed manufacturers to:

4.2.1    Exercise reasonable care in the manufacturing of Systems, with specific adherence to all plans, specifications, instructions, drawings and other information supplied by Licensor to Licensee for manufacturing the Systems.

4.2.2    Manufacture the Systems in a fit, merchantable, workmanlike and marketable manner that meets all industry standards.

4.2.3    Protect Licensor, under liability insurance policies with insurers and coverage reasonably acceptable to Licensor, from any negligence in the manufacturing of the Systems.

4.2.4    Provide to Licensee (which shall then provide to Licensor) written background materials and information about the business and expertise of such manufacturing sub Licensee's at the time contracts are executed by and between Licensee and any manufacturing sub Licensee's, and provide to Licensee (which shall then provide to Licensor and Licensor's nominee) quarterly written reports describing the status of all work-in-process at the end of each calendar quarter during the first two years of such sublicensing agreement.

4.3    **Standard of Performance.** Licensee shall use reasonable commercial efforts to perform the responsibilities described in Sections 4.1 and 4.2 above.

5.    **Relationship Created**

5.1    **Independent Contractor Status.** Licensee is not a partner or joint venturer of Licensor or Licensor's nominee for any purpose whatsoever, but is an independent contractor.

5.2    **Taxes, Licenses and Permits.** Licensee shall be responsible for Licensee's taxes, licenses, fees, permits or any other requirements for Licensee to act as an independent contractor.

SRB01083

5.3   **Expenses and Disbursements.** All expenses incurred by Licensee in connection with the performance by Licensee of Licensee's sales, marketing, distribution and manufacturing activities shall be the sole responsibility of Licensee. Licensee shall not represent to any person that Licensee has any right, power or authority to create any contract or obligation, express or implied, on behalf of or in the name of, or binding upon Licensor.

5.4   **Agents and Representatives of Licensee.**   Licensee shall be solely responsible for its own risk, expense and supervision as it relates to any of its agents or representatives working under the authority of Licensee and shall not have any claim against Licensor for any compensation or reimbursement unless otherwise agreed to in writing between the parties.

5.5   **Formation of Newco.**   The parties shall organize a new limited liability company under the laws of the state of Nevada, United States of America ("Newco"). Newco will initially be owned 65% (sixty-five percent) by Licensee's nominees and 35% (thirty-five percent) by Licensor's nominees. Newco will be formed for the express purpose of marketing and managing the development of the System in the Territory. All revenues for the System will flow through this new entity, once established. The formation of this new company will be undertaken within the terms stated in Section 2.5.

5.6   **Operation of Newco.**   This Agreement will govern the relationship between the parties and will be the basis for operation of the Newco. The licensing of the System under the Licensing Agreement will be transferred to Newco immediately upon its formation. The Licensee on formation of Newco shall appoint three managers and shall have sole responsibility for the management of Newco.

5.7   **Directors.** On formation of the Newco, Licensee shall appoint three directors and all the officers of the Newco, and the Licensor shall appoint three directors. The appointment of directors may change from time to time, however the number of Directors shall remain equal between the Licensee and the Licensor.

5.8   **Tele-Conference.** The parties agree that there shall be a telephone conference call at a regularly agreed to and mutually convenient time, a minimum of once per month. The parties shall appoint a secretary for each conference call who will record minutes of the call. These minutes will be placed in the Newco's minute book, and be distributed to the parties as soon after the meeting as practically possible.

6.   **Protection of Proprietary Rights**

Licensee shall receive and maintain in confidence all Proprietary Rights and Patent Documentation of Licensor. In addition, all books, documents, records and other material and information made known to the parties pursuant to this Agreement are hereby designated as confidential and shall be returned upon the termination of this Agreement within 10 days of request for material.   This provision shall survive the termination of this Agreement for a 10-year period from the date of termination.

7.   **Term and Performance Standard**

7

SRB01084

**7.1    Performance Standard.** During the Term of this Agreement, Licensee shall use its commercially reasonable efforts to sell as many Systems in the Territory as possible, and will use such efforts to attempt to increase such sales annually (the "Performance Standard"). The parties agree to review the Licensee's progress, no less than once every 24 (twenty-four) months.

**7.2    Term.** The term of this Agreement (the "Term") shall begin on the first day of the first full month following the date of this Agreement and shall continue for twenty-eight (28) years thereafter; provided, however, that if the statutory limit of any Patent shall expire in any part of the Territory prior to the expiration of such 28-year Term, then this Agreement shall be subject to termination by Licensor prior to such 28-year Term, ONLY as to such Patent in such part of the Territory, by giving written notice of termination to Licensee within ninety (90) days after the expiration of such Patent. If Licensor fails to terminate this Agreement, notwithstanding its right to do so, within such time requirement, the Agreement shall continue as if no termination had occurred. Notwithstanding the foregoing, this Agreement may be terminated in writing in accordance with any of the provisions noted in Section 7.3 below. If any orders for Systems are in the process of manufacturing, delivery and/or installation, but such process has not been completed before the end of the applicable Participation period, then the Participation due from such orders shall apply to satisfying requirements set forth herein as if such Participation had been paid.

**7.3    For Cause Termination**

**7.3.1    Commission** of a felony by Licensee, or any plea of nolo contendere to a felony charge, in the course of performance or Term of this Agreement shall automatically terminate this Agreement with no written notification required.

**7.3.2    In** the event of the filing by or against Licensee of a Chapter 7 bankruptcy liquidation proceeding, whether voluntary or involuntary, which is finalized by court action, Licensor may, in addition to any other right or remedy provided by this Agreement or by law, terminate all or any part of this Agreement without any liability to Licensee or any other person or entity on account thereof.

**7.3.3    The** breach by Licensee of any provision hereof other than Sections 8.1 or 8.2, shall entitle Licensor and Licensor's nominee to terminate this Agreement after (a) written notice is provided to Licensee specifically describing the breach, and (b) Licensee fails to cure such breach within 30 days after receipt of such notice; provided, however, that if such breach cannot reasonably be cured within such 30-day period, then such breach shall be deemed cured if Licensee commences the actions necessary to cure such breach within such 30-day period and thereafter continues and completes such cure in as timely a manner as possible.

**8.    Participation**

**8.1    Computation of Participation.** The Newco will distribute profits in accordance with the ownership allocations of the Newco described in Section 5.5. The amount paid will be reflected by the profit generated by the Licensee in its efforts to market and sell the System throughout the Territory and from the revenues of its distributors and/or sublicensees. Licensee shall use its best efforts to cause a metering device to be installed on projects that require monitoring of production to provide, for the benefit of all the owners of the Newco, accurate

SRB01085



records of the total number of linear feet of the System installed on each project. The Licensee will utilize a recognized Certified Public Accountant ("CPA") for the completion of its books and financial records.

   8.2    **Payment of Participation.** Payments to Licensor's nominee shall be made by wire transfer to Licensor's nominee's bank, pursuant to Licensor's nominee's wiring instructions provided to Licensee from time to time during the Term. Concurrent with each payment, Licensee shall send to Licensor's nominee an appropriate accounting of the computation of the Participation for which the payment is being made. All distributions of profits will be paid annually unless otherwise agreed to.

   8.3    **No Requirements as to Sales Price.** Nothing contained herein shall restrict in any way Licensee's right, in its sole and absolute discretion, to establish the price, which it elects from time to time to charge for the sale of the System to buyers. Such price will be established from time to time and in keeping with the current economic conditions, type of sale, location and potential market. The Directors of the Newco will review such sale prices prior to any contract being made.

   8.4    **Audit and Inspection Rights.** Licensor's nominee shall have the right, at its sole cost and expense, at any reasonable time during normal business hours of Licensee, but no more often than once in any twelve month period, to cause an independent accounting firm which is acceptable to both parties to inspect and audit the records of Licensee and the Newco relating to Licensee's total sales of Systems and the computation of the Participation. If any such inspection or audit results in the required payment of an aggregate of 5% or more above the amount of the Participation previously paid for the audited period, then Licensee shall be responsible for the cost of such audit. The Licensee agrees to make available a report from the CPA of the company on a semi-annual basis.

   9.    **License Fee Renewal**

        The Licensee will cause to be paid to the Licensor an annual renewal fee for the Intellectual and Proprietary Property. This fee will be paid on the anniversary of the initial payment noted in Section 2.3. The renewal fee will be US$25,000 (twenty-five thousand US dollars) and will be indexed to reflect the annual change in the Consumer Price Index for the greater Los Angeles area.

10.    **Indemnification**

   Each party shall indemnify and hold harmless the other party from and against any liability, costs or expenses arising out of the indemnifying party's breach of this Agreement and failure to timely cure such breach as provided herein.

11.    **Attorney's Fees**

   If any legal action is brought to enforce the terms of this Agreement, or brought pursuant to a dispute arising out of such terms, the successful or prevailing party shall be entitled to recover all reasonable fees and costs incurred in such action or proceeding, including but not limited to attorney's fees, in addition to any other relief to which it may be entitled.

8

SRB01086



12.    Counterpart Agreements

This Agreement may be executed in any number of counterparts, and each counterpart shall constitute an original instrument, but all such separate counterparts shall constitute only one and the same instrument.

13.    Governing Law

This Agreement is made in, governed by and shall be construed solely in accordance with the internal laws of the State of California, and no conflicts of laws or provisions therein shall apply.

14.    Authority

Both parties represent and warrant to each other that they have the right and lawful authority to enter into this Agreement for the purpose herein and there are not other outstanding agreements or obligations inconsistent with the terms and provisions hereof.

15.    Notices

15.1   Air Courier. Any notice, demand or request required or permitted to be given hereunder shall be in writing and shall be deemed effective three (3) business days after having been deposited with an international air courier for next business day delivery, or if next business day delivery is not available, then for delivery as soon as possible by such courier, addressed to the addressee at its main office, as set forth in the addressee's last communication to the other party.

15.2   Change in Address. Either party may change its address for purposes of this Agreement by written notice to the other party given in accordance with this Agreement.

This Agreement is entered into and shall be deemed effective as of the Effective Date.

Licensor:                  WILTIN PTY LIMITED,
                           An Australian company
                           (ACN 061 777 946)

                    By:    _S M Andrews_
                           Susan M. Andrews
                           Company Director

Licensee:                  International Fabricated Buildings, Inc.,
                           A Nevada corporation

                    By:    _____

10

SRB01087

**EXHIBIT 3**

SETTLEMENT AGREEMENT

This Settlement Agreement and Release ("Settlement Agreement") is made effective as of the 20th day of July, 2006 between Pandora Select Partners, L.P. ("Pandora"), Trakloc International, LLC ("Trakloc"), Albert S. Hill ("Hill") and Richard E. Knecht ("Knecht").

WHEREAS, Pandora loaned $2.2 million to Trakloc in May 2004 which loan has been fully repaid, but in connection therewith Pandora has alleged certain claims against Hill and Knecht (which allegations Hill and Knecht have denied);

WHEREAS, at Trakloc's request, Pandora loaned $3.6 million to Southeastern Metal, Inc. ("SEM") in July 2004 and Trakloc guaranteed that loan which has not been repaid and is currently in default;

WHEREAS, at Trakloc's request, Pandora loaned an additional $700,000 to SEM in June 2005 and Trakloc guaranteed that loan which has not been repaid and is currently in default (the $3.6 million loan and the $700,000 loan are referred to collectively as the "SEM Loans").

WHEREAS, after Pandora gave notice of default and acceleration of the SEM Loans to SEM, Trakloc, and Gary L. Nelson, Jr. ("Nelson" – another guarantor of the SEM Loans) in February 2006, neither SEM nor any of its guarantors paid the SEM Loans and Pandora commenced litigation in the United States District Court for the District of Minnesota captioned <u>Pandora Select Partners, L.P. v. Trakloc International, LLC, et al.,</u> Court File No. 05-02229 MJD/SRN ("the Litigation"); and

WHEREAS, in the Litigation Trakloc has alleged that Trakloc has been released from its guaranties, which allegations Pandora has denied, and has sought reimbursement from SEM for amounts Trakloc has paid to Pandora pursuant to the guaranties.

WHEREAS, the Parties hereto wish to settle the Litigation and make arrangements for certain payments to Pandora according to the terms and conditions described herein;

IT IS HEREBY AGREED AS FOLLOWS:

1.    Simultaneously with the execution of this Settlement Agreement, and in consideration thereof, Trakloc has provided Pandora with a fully executed Confession of Judgment in the form attached hereto as Exhibit A.

2.    Simultaneously with the execution of this Settlement Agreement, and in consideration thereof, Trakloc has provided Pandora with an undertaking by Wiltin PTY LTD in the form attached hereto as Exhibit B.

3.    Simultaneously with the execution of this Settlement Agreement, and in consideration thereof, each of Hill and Knecht has provided Pandora with fully executed Guaranties in the form attached hereto as Exhibits C-1 and C-2 and fully executed Confessions of Judgment in the form attached hereto as Exhibits D-1 and D-2.

4.    The Trakloc Confession of Judgment, the Hill and Knecht Guaranties and the Hill and Knecht Confessions of Judgment shall be held by Pandora's counsel and no action shall be taken with regard to any of them until the earlier of the following:  (a) Trakloc's failure to make payment as described in Paragraph 7 below; or (b) a declaration by the Decision Maker (defined below) of Trakloc's violation of the ordinary course of business requirements set out in Paragraphs 12 – 13 below.

5.    The Parties stipulate and agree that as of July 15, 2006, the sums owing to Pandora with respect to the SEM Loans are as follows:

$3.6 million loan

| | | |
|---|---|---|
| Principal | = | $3,007,803.31 |
| Interest | = | $  435,710.17 |
| Per diem | = | $      1,002.60 |

2

$700,000 loan

| | | |
|---|---|---|
| Principal | = | $494,718.35 |
| Interest | = | $ 22,097.42 |
| Per diem | = | $  164.91 |

| | | |
|---|---|---|
| Collection Costs | = | $304,578.15 through July 14, 2006 |
| | | $ 20,000.00 from July 14 to July 20, 2006 |

6.      Simultaneously with the execution of this Settlement Agreement, and in consideration thereof, Trakloc shall pay to Pandora the sum of $300,000 which shall be used first to pay all but $100,000 of Pandora's Collection Costs described in the preceding Paragraph with the balance applied next to outstanding interest on the SEM Loans.

7.      At or before 5:00 p.m. Central Daylight Savings Time on October 26, 2006, Trakloc shall pay to Pandora (by wire transfer) the balance of all sums owing to Pandora under the SEM Loans, with the exception of $100,000 in Collection Costs (the "Settlement Amount"). If Trakloc fails to pay the Settlement Amount in full on or before the date and time it is due pursuant to this Paragraph, Pandora may immediately exercise any and all of the rights granted to it by the Trakloc Confession of Judgment, the Hill and Knecht Guaranties and/or the Hill and Knecht Confessions of Judgment.

8.      If, but only if, Trakloc pays the Settlement Amount timely, as described in Paragraph 7 above, upon receipt of that payment, Pandora shall assign to Trakloc all right, title and interest of Pandora in and to the SEM Loans, the promissory notes that evidence the SEM Loans, and all collateral therefore and all guaranties thereof (and collateral for those guaranties), as well as and including, but not limited to, the Trakloc warrants, the SEM warrants and the individual guarantee of Nelson.

9.      Notwithstanding the assignment from Pandora to Trakloc that is contemplated by Paragraph 8 above, Trakloc, on behalf of itself and any of its assigns, hereby agrees that it will

3

forbear from commencing any collection, indemnification or contribution action against SEM or

Nelson until the earlier of (a) six months after payment of the Settlement Amount; (b) six

months after the date that all obligations related to the SEM Loans have been paid in full; or (c)

payment in full by Trakloc of all obligations related to the SEM Loans (or timely payment of

the Settlement Amount) and payment in full of the sums owing from SEM to Pandora with

respect to the equipment lease attached hereto as Exhibit F (the balance owing as of July 15,

2006 is $836,012.88 with a per diem of $334.17). This Paragraph of this Settlement Agreement

is for the benefit of, and may be enforced by SEM and/or Nelson, as well as the Parties to the

Settlement Agreement. Despite said obligation to forebear, and upon payment of the Settlement

Amount, Trakloc may send or file appropriate notices of assignment of the loans and all

collateral therefore and may act to preserve its interest in and the value of said collateral, as

permitted by the terms of the SEM loan documents with Pandora and the Nelson guarantee.

10.    When requested by Trakloc, Pandora shall immediately confirm in writing to any

person or entity specified by Trakloc the dollar total of the Settlement Amount, as well as the

existence and validity of this Settlement Agreement and whether any default exists under its

terms.

11.    Simultaneous with the execution of this Settlement Agreement, Trakloc shall

provide Pandora with Trakloc's accurate but unaudited balance sheet and income statement for

each of the most recent six months, and its check register(s) for the same period. Every two

weeks, beginning two weeks after the execution of this Settlement Agreement and continuing

until the date on which the SEM Loans are paid in full, Trakloc shall provide Pandora with

Trakloc's then current accurate but unaudited balance sheet, income statement, and check

register.

4

12.    During the period between execution of the Settlement Agreement and the date on which the SEM Loans are assigned to Trakloc, Trakloc shall not (i) take any action outside of the ordinary course of business; (ii) take any action to terminate, modify or amend its Amended and Restated Operating Agreement (effective April 19, 2004) ("the Operating Agreement") which impairs Pandora's interest in the "Collateral" (as defined in Exhibit B hereto), except with the express written consent of Pandora; (iii) fail to deliver to Pandora a copy of each demand or notice received by Trakloc or given by Trakloc relating to the Operating Agreement or to any other Collateral which could reasonably be expected to have a material adverse effect upon the Collateral or Pandora's rights therein; or (iv) sell, contract to sell, assign, transfer or dispose of any of the Collateral, except in the ordinary course of business, or with the consent of Pandora.  Pandora acknowledges and agrees that Trakloc shall be entitled to use the cash receipts from the collection of its accounts receivable and the cash receipts from the collection of its contract payables, for any legal purpose in the ordinary course of business without notice to, or the consent of Pandora.  In addition, Trakloc shall not take any action in connection with the Collateral which would impair in any material respect the interests or rights of Pandora; *provided, however,* that nothing in this Agreement shall prevent Trakloc from undertaking Trakloc's operations in the ordinary course of business.  Trakloc shall not directly or indirectly create, incur, assume or suffer to exist any liens on or with respect to all or any part of the Collateral (other than the lien created by this Agreement).  With notice to and the consent of Pandora, which consent will not be unreasonably withheld, Trakloc may contract to sell, assign, transfer, or dispose of the Collateral, subject to Pandora's prior liens and provided that such transaction provides for simultaneous payment in full of the Settlement Amount.

5

13.    If Trakloc violates the requirements of Paragraph 11 above, at any time during the period between execution of the Settlement Agreement and the date on which the SEM Loans are paid in full, such violation shall give Pandora the right to immediately file and execute upon the Trakloc Confession of Judgment, the Hill and Knecht Guaranties and the Hill and Knecht Confessions of Judgment. The sole process for determining whether a triggering violation has occurred is as follows: (a) Pandora gives written notice via facsimile to Trakloc, Hill, Knecht and their counsel, Tom Goodman, of the suspected violation; (b) within 48 hours a telephonic or in person conference is held between counsel for the Parties and Mr. John Borg[1], who the Parties have mutually selected as the decision maker (the "Decision Maker") for this issue) who will then immediately decide whether a violation has occurred. This process and the resulting decision will not be delayed for any reason and are final, binding and not subject to review by any court. The Decision Maker may review any documents submitted by the parties, may meet with any of them or their representatives, and may follow any procedure established by him or her as, in his or her discretion, seems appropriate to ensure fairness in the process and the result, subject to the requirement that a decision be rendered within 72 hours of the notice specified in part (a) of this Paragraph.

14.    Absent a violation of the requirements of Paragraph 12 above, during the period between execution of the Settlement Agreement and October 26, 2006, Pandora will not seek the appointment of a receiver and will not take any action to interfere with Trakloc's ability to raise the funds necessary to pay the SEM Loans. This Paragraph does not require any

---

[1] The Parties have selected Mr. Thomas Fraser and Mr. Richard Solum as alternative Decision Makers on this issue and if Mr. Borg is not available when needed, the issue will be presented to and decided by either Mr. Fraser or Mr. Solum (depending upon availability), according to the same procedure.

6

affirmative action by Pandora nor does it limit Pandora's rights and remedies as described in this Settlement Agreement and the Exhibits hereto.

15.    Upon and by execution of this Settlement Agreement and in consideration thereof, the Parties shall instruct their respective counsel to take all steps necessary to dismiss with prejudice the claims that have been asserted in the Litigation by Pandora against Trakloc, Hill and Knecht, and by Trakloc against Pandora.  In addition, Trakloc, Hill and Knecht hereby direct their counsel to take all steps necessary to dismiss without prejudice the claims they have asserted against SEM and/or Nelson.

16.    In consideration of the covenants, promises and obligations described in this Settlement Agreement, Pandora, Trakloc, Hill and Knecht agree to release, acquit, and discharge each other, and their agents, successors, and assigns, and never to continue prosecution of nor commence any action based in whole or in part upon, any and all debts, claims, liabilities, demands, and causes of action of every kind, nature, and description, which have arisen or could have arisen prior to or as of July 20, 2006.  The parties' respective release of claims as set forth in this paragraph extend to all claims of every nature and kind whatsoever, known or unknown, suspected or unsuspected, past or present, which existed prior to or as of July 20, 2006, notwithstanding any and all rights that any of the parties may have under any federal or state statute or common law principle that would otherwise limit the effect of this Agreement to claims known or suspected at the time of execution of this Settlement Agreement. Each of the parties specifically waives the provisions of Section 1542 of the California Civil Code, which reads as follows:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

7

Notwithstanding the provisions of Section 1542, and for the purpose of implementing a full and complete release and discharge of all claims, each of the parties expressly acknowledges that this Settlement Agreement is intended to include in its effect, without limitation, all the claims described in this paragraph above, whether known or unknown, and that this Settlement Agreement contemplates the extinction of any and all such claims, including claims for attorneys' fees and costs. However, the parties do not intend to release any of the obligations or liabilities created by this Settlement Agreement, the Trakloc Confession of Judgment, the Knecht and Hill Guarantees and/or the Knecht and Hill Confessions of Judgment, all of which obligations and liabilities shall remain in full force and effect.

17. The parties agree that upon payment of the Settlement Amount or payment in full of the SEM Loans by or on behalf of Trakloc, Hill, Knecht or any combination of them, and not through Pandora's liquidation of Collateral, the parties will execute a second general release in the form attached hereto as Exhibit G.

18. The undersigned parties have full power and all requisite authority to execute and perform this Settlement Agreement and have not assigned or transferred any of the claims hereby released.

19. The parties acknowledge that this Settlement Agreement (together with its Exhibits) contains the entire agreement between them regarding the matters set forth and that it supersedes all previous negotiations, discussions, writings and understandings regarding such matters. The parties further acknowledge that no representations, inducements, promises or agreements, whether oral or written, have been made by any party or by anyone acting on behalf of any party, which are not embodied in this Settlement Agreement.

8

20.    This Settlement Agreement may be modified only by a written document signed by all parties that makes specific reference to this Settlement Agreement.

21.    In the event that any provision in or obligation under this Settlement Agreement shall be invalid, illegal, or unenforceable in any jurisdiction, the validity, legality, or enforceability of other provisions in or obligations under this Settlement Agreement shall not in any way be affected or impaired thereby.

22.    The parties acknowledge that they are represented by counsel of their own choosing in this matter, have reviewed the contents of this Settlement Agreement with such counsel, and are relying on their own judgment and the advice of their own counsel in executing this Settlement Agreement.   All of the terms of this Settlement Agreement are contractual and none is a mere recital.

23.    If any legal action or other proceeding is brought for the enforcement of this Settlement Agreement, or because of an alleged dispute or alleged breach in connection with any of the provisions of this Settlement Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which the prevailing party may be entitled.

24.    This Settlement Agreement shall be binding on, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.

25.    This Settlement Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same instrument.  Faxed signature pages shall be treated as an original signature.

26.   All parties have participated in the drafting and negotiation of this Settlement Agreement. This Settlement Agreement shall be deemed to have been drafted by all the parties.

27.   This Settlement Agreement shall be governed by and construed pursuant to the laws of the State of Minnesota applicable to contracts made and performed in the State of Minnesota without reference to any conflict or choice of law rules that would otherwise apply. Any suit, action or proceeding arising out of or in connection with this Settlement Agreement may only be brought in the Minnesota District Court for Hennepin County, Minnesota, or the United States District Court for the District of Minnesota, and the parties hereto irrevocably submit and consent to the jurisdiction of each such court, and agree that any summons, complaint, writ, judgment or other notice or service or legal process may be sufficiently served upon it in connection with any such suit, action or proceeding, if sent to the last known address of the applicable party.

PANDORA SELECT PARTNERS, L.P.
Pandora Select Advisors LLC

By: Jonathan Wood,
Its: Director

Subscribed and sworn to before me
this 20th day of July, 2006.

Notary Public

10

TRAKLOC INTERNATIONAL, INC.

By: _____
Its: _Albert S. Hill_
_President_

Subscribed and sworn to before me
this 20th day of July, 2006.

_____
Notary Public

> STEPHEN R. BEMIS
> Commission # 1461130
> Notary Public - California
> Orange County
> My Comm. Expires Jan 6, 2008

ALBERT S. HILL

_____

Subscribed and sworn to before me
this 20th day of July, 2006.

_____
Notary Public

> STEPHEN R. BEMIS
> Commission # 1461130
> Notary Public - California
> Orange County
> My Comm. Expires Jan 6, 2008

RICHARD E. KNECHT

_Richard E Knecht_

Subscribed and sworn to before me
this 20th day of July, 2006.

_____
Notary Public

> STEPHEN R. BEMIS
> Commission # 1461130
> Notary Public - California
> Orange County
> My Comm. Expires Jan 6, 2008

11

**EXHIBIT 4**

OCT-24-2006  15:51                                                          P.02/04
10/24/2006 15:50 FAX 6123398591          SIEGEL BRILL                       @002
        OCT 24 '06  01:06PM KNECHT & HANSEN                                 P.2

## AMENDMENT TO SETTLEMENT AGREEMENT

This Amendment to Settlement Agreement ("Amendment") is made effective as of the 24th day of October, 2006, between Pandora Select Partners, L.P. ("Pandora"), Trakloc International, LLC ("Trakloc"), Albert S. Hill ("Hill") and Richard E. Knecht ("Knecht"). This Amendment has been executed to satisfy the requirements of Paragraph 20 of the July 20, 2006, Settlement Agreement between the parties.

1.     Paragraph 7 of the Settlement Agreement is amended to read as follows:

        7.     At or before 5:00 p.m. Central Daylight Savings Time on November 7, 2006, Trakloc shall pay to Pandora (by wire transfer) the balance of all sums owing to Pandora under the SEM Loans, with the exception of $95,000 in Collection Costs (the "Settlement Amount"). If Trakloc fails to pay the Settlement Amount in full on or before the date and time it is due pursuant to this Paragraph, Pandora may immediately exercise any and all of the rights granted to it by the Trakloc Confession of Judgment, the Hill and Knecht Guaranties and/or the Hill and Knecht Confessions of Judgment.

2.     With the exception of Paragraph 7, none of the terms and conditions of the Settlement Agreement have been waived or amended and all remain binding and enforceable.

3.     The consideration for this Amendment is the sum of $1,500,000 paid by Trakloc to Pandora by wire transfer on or before October 26, 2006. If the full payment is not timely received by Pandora, this Amendment will be void and of no effect whatsoever. This payment is not refundable but shall be treated as a credit against the Settlement Amount (as defined in the Settlement Agreement).

[SIGNATURE PAGES FOLLOW]

PANDORA SELECT PARTNERS, L.P.

By: _____
Its: MANAGING PARTNER

Subscribed and sworn to before me
this 24 day of October, 2006.

_____
Notary Public

PAUL W. FOX
Notary Public
State of Minnesota
My Commission Expires
January 31, 2010

TRAKLOC INTERNATIONAL, INC.

By: _____
Its: _____

Subscribed and sworn to before me
this _____ day of October, 2006.

_____
Notary Public

ALBERT S. HILL

_____

Subscribed and sworn to before me
this _____ day of October, 2006.

_____
Notary Public

2

OCT-24-2006  15:51
10/24/2006 15:50 FAX 6123396591          SIEGEL BRILL                        P.03/04
                                                                            @003
    OCT 24 '06  01:07PM KNECHT & HANSEN                                      P.3

PANDORA SELECT PARTNERS, L.P.

By:_____
Its:_____

Subscribed and sworn to before me
this _____ day of October, 2006.

_____
Notary Public

TRAKLOC INTERNATIONAL, ~~INC.~~  LLC  *lk*
                                      A.H.

By: *Albert S Hill*
Its: *Albert S. Hill, President*

Subscribed and sworn to before me
this *24th* day of October, 2006.

*Barbara J. Marshall*
Notary Public

BARBARA J. MARSHALL
Commission # 1611162
Notary Public - California
Orange County
My Comm. Expires Sep 3, 2008

ALBERT S. HILL

*Albert S Hill*

Subscribed and sworn to before me
this *24th* day of October, 2006.

*Barbara J. Marshall*
Notary Public

BARBARA J. MARSHALL
Commission # 1611162
Notary Public - California
Orange County
My Comm. Expires Sep 3, 2008

2

OCT-24-2006 15:51                                              P.04/04
10/24/2006 15:50 FAX 6123398591          SIEGEL BRILL          ☑004
    OCT 24 '06 01:07PM KNECHT & HANSEN                          P.4

RICHARD E. KNECHT

*Richard E. Knecht*

Subscribed and sworn to before me
this _24th_ day of October, 2006.

*Barbara Marshall*
Notary Public

BARBARA J. MARSHALL
Commission # 1511162
Notary Public - California
Orange County
My Comm. Expires Sep 3, 2008

3

**EXHIBIT 5**

1 | JODI S. COHEN, CASB No. 151534
2 | BENTLEY P. STANSBURY III, CASB No. 229102
   | KEESAL, YOUNG & LOGAN
   | A Professional Corporation
3 | 400 Oceangate
   | P.O. Box 1730
4 | Long Beach, California 90801-1730
   | Telephone:   (562) 436-2000
5 | Facsimile:   (562) 436-7416

6 | Attorneys for Plaintiff
   | PANDORA SELECT PARTNERS, L.P.

7

F I L E D
SUPERIOR COURT OF CALIFORNIA
COUNTY OF RIVERSIDE

NOV 13 2006

D. Mathews

8 | **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9 | **FOR THE COUNTY OF RIVERSIDE**

10

11 | PANDORA SELECT PARTNERS, L.P.,     ) Case No. RIC-460308
12 |                         Plaintiff,  ) Action Filed: 11-13-06
13 |             vs.                     ) ASSIGNED FOR ALL PURPOSES TO:
   |                                     ) Judge _____, Dept. ____
14 | TRAKLOC INTERNATIONAL, LLC and     )
   | SOUTHEASTERN METALS, INC.,         ) **REQUEST FOR ENTRY OF**
15 |                         Defendants. ) **CONFESSION OF JUDGMENT**
16 |                                     )
17 | _____)

18

19 |         On July 20, 2006, Plaintiff PANDORA SELECT PARTNERS, L.P.

20 | ("Pandora") and TRAKLOC INTERNATIONAL, LLC ("Trakloc") entered into a

21 | Settlement Agreement through which Trakloc agreed to pay the sums owing Pandora by

22 | October 26, 2006.  As part of the Settlement Agreement, Trakloc signed the Confession

23 | of Judgment that is being filed herewith.  On October 24, 2006, Pandora and Trakloc

24 | entered into an Amendment to the Settlement Agreement which allowed Trakloc until

25 | ///

26

27

28 | ///

LB1070630

REQUEST FOR ENTRY OF CONFESSION OF JUDGMENT

1  November 7, 2006 to pay the amounts due under the Settlement Agreement. Trakloc

2  has failed to pay the amounts due. Therefore, pursuant to the terms of the Settlement

3  Agreement and Confession of Judgment, Pandora is entitled to file the Confession of

4  Judgment in this Court.

5

6  DATED: November _10_, 2006

7  JODI S. COHEN
   BENTLEY P. STANSBURY III

8  KEESAL, YOUNG & LOGAN
   Attorneys for Plaintiff

9  PANDORA SELECT PARTNERS, L.P.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 2 -

LB1070630

EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF _____

| | |
|---|---|
| PANDORA SELECT PARTNERS, L.P., | File No. _____ |
| Plaintiff, | |
| vs. | CONFESSION OF JUDGMENT |
| TRAKLOC INTERNATIONAL, LLC (a Nevada limited liability company), | |
| Defendant. | |

Trakloc International, LLC ("Trakloc") executes this Confession of Judgment Statement in accordance with Minnesota Statute Section 548.22 and Cal. Civ. Proc. Code §§ 1132-1134, in connection with the following obligation:

I.    STATEMENT OF FACTS OUT OF WHICH INDEBTEDNESS AROSE

1.    Trakloc is a guarantor of certain debts owing from Southeastern Metal, Inc. ("SEM"), to Pandora Select Partners, L.P. ("Pandora"), as evidenced by the Guaranties that are attached hereto as Exhibits 1 and 2.

2.    The SEM debts are in default, and Trakloc has defaulted on its guarantee obligations.

3.    As a result of those defaults, Pandora commenced litigation against Trakloc and others in the United States District Court for the District of Minnesota (Court File No. 05-02229 MJD/SRN).  After Pandora filed a summary judgment motion but before

that motion could be heard, Trakloc and Pandora entered into settlement negotiations that ultimately resulted in the Settlement Agreement that is attached hereto as Exhibit 3.

    4.    As consideration for the Settlement Agreement, Trakloc agreed to provide this Confession of Judgment.

## II.    AGREEMENT

Trakloc agrees to pay Pandora the sum of $4,184,907.40 which includes all of the principal, accrued interest, and collection costs (net of a $100,000 discount) due and owing on the SEM debts and the Trakloc guaranties as of July 15, 2006, plus a per diem of $1,167.51 after July 15, 2006 until paid in full, on or before October 26, 2006.

## III.    WARRANT OF ATTORNEY

    1.    In the event that Pandora does not receive the payment specified above by 5:00 p.m. Central Daylight Savings Time on October 26, 2006, Trakloc will be in default under the Settlement Agreement and this Confession of Judgment. In such event, Pandora shall be immediately entitled to the sum of $4,401,658.40 and also entitled to take immediate possession of and liquidate in a commercially reasonable manner (as described in Exhibit 4 hereto) all of the Collateral (as defined in Exhibit E of the Settlement Agreement.) In such case, Trakloc hereby authorizes and appoints any attorney designated by Pandora to appear in any court of competent jurisdiction in the State of Minnesota and/or the State of California to confess judgment on behalf of Trakloc, and waiving issuance of the service of process, hereby confesses judgment in the amount designated in this paragraph, and authorizes and empowers said court to immediately enter judgment against Trakloc, and in favor of Pandora, for the sum of

$4,401,658.40, together with the costs, disbursements, and attorneys' fees reasonable and incident to obtaining and enforcing said judgment. Trakloc further authorizes the attorney designated by Pandora to confess judgment against Trakloc and in favor of Pandora authorizing Pandora to immediately take possession of and liquidate the Collateral in a commercially reasonable manner to satisfy the monetary judgment. In order to obtain entry of judgment, Pandora and/or its counsel need only file with the Court an affidavit establishing the balance owed by Trakloc to Pandora.

2.      The total specified in Paragraph 1 does not exceed the liability of Trakloc to Pandora.

3.      Trakloc specifically submits to the jurisdiction of the state and federal courts of Minnesota and California with respect to any and all matters relating to this Confession of Judgment and/or the enforcement of any judgment entered pursuant thereto.

4.      Trakloc hereby authorizes and empowers the Court to enter judgment against Trakloc, and in favor of Pandora, for the sum above specified, and for immediate possession and liquidation of the Collateral in a commercially reasonable manner.

5.      Trakloc waives and releases all errors which may intervene in any such proceeding and consents to immediate execution upon said judgment, hereby ratifying and confirming any such action as said attorney for Pandora may do by virtue hereof.

6.      Trakloc specifically and voluntarily waives any hearing which may be required prior to obtaining a judgment by confession, and acknowledges that this Confession of Judgment, including the Warrant of Attorney, has been read by the

115606.1

3

undersigned, who is a duly authorized agent of Trakloc and who hereby acknowledges receipt of a copy hereof.

IN WITNESS WHEREOF, this Confession of Judgment and Warrant of Attorney to Enter Judgment by Confession has been executed and verified by Trakloc International, LLC this _20th_ day of July, 2006.

TRAKLOC INTERNATIONAL, LLC

By: _____
Its: _Albert S. Hill_
_President_

Subscribed and sworn to before me
this _20th_ day of July, 2006.

_____
Notary Public

STEPHEN R. BEMIS
Commission # 1461130
Notary Public - California
Orange County
My Comm. Expires Jan 6, 2008

115606.1

4

## VERIFICATION

_Albert S. Hill_, being first duly sworn on oath, deposes and states that he

is the _President_ of Trakloc International, LLC, that he is authorized on behalf of

Trakloc International, LLC to act on behalf of Trakloc International, LLC, that he has

read the foregoing Confession of Judgment and Warrant of Attorney to Enter Judgment,

that he knows the contents thereof, and that the facts stated therein are true and correct of

his own knowledge.

TRAKLOC INTERNATIONAL, LLC

By: _(signature)_
Its: _Albert S. Hill_
_President_

Subscribed and sworn to before me
this _20th_ day of July, 2006.

_(signature)_
Notary Public



STEPHEN R. BEMIS
Commission # 1461130
Notary Public · California
Orange County
My Comm. Expires Jan 6, 2008

115606.1                                    5

UNITED STATES DISTRICT COURT

DISTRICT OF _____

| | |
|---|---|
| PANDORA SELECT PARTNERS, L.P.,<br><br>Plaintiff,<br><br>vs.<br><br>TRAKLOC INTERNATIONAL, LLC (a<br>Nevada limited liability company),<br><br>Defendant. | File No. _____<br><br><br>**CERTIFICATE OF**<br>**DEFENDANT'S ATTORNEY** |

The undersigned hereby certify that:

1.     We represent the defendant Trakloc International, LLC ("Trakloc") in this matter;

2.     We are independent representatives of the defendant Trakloc;

3.     We have examined the proposed judgment ("Confession of Judgment");

4.     We have advised defendant Trakloc with respect to the waiver of rights and defenses under the confession of judgment procedure;

5.     We have advised defendant Trakloc to utilize the confession of judgment procedure; and

6.     If this action is commenced in California, this statement will be filed with the clerk of the court in which judgment is to be entered and will be filed with the Confession of Judgment as required by CAL. CIV. PROC. CODE § 1133.

#115671

Dated: July 21, 2006

SIEGEL, BRILL, GREUPNER, DUFFY & FOSTER, P.A.


By: _____
    Thomas H. Goodman (#_____)
1300 Washington Square
100 Washington Ave. S.
Minneapolis, MN 55401
(612) 337-6100

ATTORNEY FOR DEFENDANT

115671.1

2

**EXHIBIT 6**

**EXHIBIT B**
**CONTINGENT LICENSE AND WORKING AGREEMENT**

This Contingent License and Working Agreement (this "Agreement") is entered into as of the 15th day of July 2006 by and between Trakloc International, LLC ("Trakloc"), Wiltin PTY LTD. ("Wiltin"), and Pandora Select Partners, L.P. ("Pandora").

WHEREAS, Wiltin is the Licensor in a License Agreement with an effective date of January 30, 2002 ("License Agreement"-Exhibit 1 hereto) and is the Licensor in an Intellectual Property and Working Agreement with an effective date of January 30, 2002 ("Working Agreement" – Exhibit 2 hereto);

WHEREAS, the License Agreement and the Working Agreement have not been amended or modified since their effective date, constitute assets of Trakloc which is the Licensee under both agreements, and remain in effect and good standing without default by any party thereto;

WHEREAS, Trakloc and Pandora have entered into a Settlement Agreement (Exhibit 3 hereto) pursuant to which, and upon the occurrence of specified events which have not yet occurred, Pandora may in the future be entitled to take possession of some or all of the assets of Trakloc, including the License Agreement and Working Agreement; and

WHEREAS, as a condition of the Settlement Agreement, Pandora has required that Trakloc provide this Agreement with Wiltin, and the execution and performance of the Settlement Agreement will advance Wiltin's interests (economic and otherwise);

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      Wiltin will not terminate or amend either the License Agreement or the Working Agreement so long as this Agreement remains in effect. Wiltin expressly waives its contractual right to effect such a termination pursuant to Section 7.3 of the Working Agreement. This

Agreement will remain in effect from July 15, 2006 until the earlier of (a) the date upon which the SEM Loans have been paid in full pursuant to Paragraph 7 of the Settlement Agreement, or (b) the date 12 months after which Pandora or its assignee has become the Licensee under the License Agreement and the Working Agreement.

2.    In the event that Pandora becomes entitled under the Settlement Agreement to take possession of some or all of Trakloc's assets, Wiltin and Trakloc hereby consent to Pandora or its assignee replacing International Fabricated Buildings, Inc. and/or Trakloc as the Licensee under the License Agreement and the Working Agreement. Wiltin and Trakloc will cooperate in effecting the transfer to Pandora or its assignee by taking such actions, including the execution of additional documents, as may be reasonably necessary.

3.    In the event that Pandora or its assignee becomes the Licensee under the License Agreement and/or the Working Agreement, Wiltin will not seek to terminate either of the agreements except as may be expressly allowed by their terms. Rather, Wiltin will deem all of the terms of the License Agreement and the Working Agreement to remain in full force and effect, save only the following amendments:

- Sections 5.5 through 5.7 of the Working Agreement will be deleted in their entirety. Wiltin will not have any ownership interest in Licensee and will not have any right to manage nor name directors to Licensee's Board of Directors.

- Section 7.3 of the Working Agreement shall be suspended. Wiltin will not be able to terminate the Working Agreement or the License Agreement for a period of 12 months after the date on which Pandora or its assignee has become the Licensee under the License Agreement and the Working Agreement.

- Section 9 of the Working Agreement will be deleted in its entirety and replaced with the following: The consideration to Wiltin for the Working Agreement and the License Agreement shall consist solely of payment from Licensee to Wilton of 1.35% of any royalties paid to Licensee by its sublicensees.

All other provisions of the License Agreement and Working Agreement will remain unchanged.

115689.1                                          2

4.     The undersigned parties have full power and all requisite authority to execute and perform this Agreement.

5.     The parties acknowledge that this Agreement (together with its Exhibits) contains the entire agreement between them regarding the matters set forth and that it supersedes all previous negotiations, discussions, writings and understandings regarding such matters.  The parties further acknowledge that no representations, inducements, promises or agreements, whether oral or written, have been made by any party or by anyone acting on behalf of any party, which are not embodied in this Agreement.

6.     This Agreement may be modified only by a written document signed by all parties that makes specific reference to this Agreement.

7.     The parties acknowledge that they are represented by counsel of their own choosing in this matter, have reviewed the contents of this Agreement with such counsel, and are relying on their own judgment and the advice of their own counsel in executing this Agreement. All of the terms of this Agreement are contractual and not a mere recital.

8.     If any legal action or other proceeding is brought for the enforcement of this Agreement, or because of an alleged dispute or alleged breach in connection with any of the provisions of this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that action or proceeding, in addition to any other relief to which the prevailing party may be entitled.

9.     This Agreement shall be binding on, and shall inure to the benefit of, the parties hereto and their respective successors and assigns.

10.     This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts,

taken together, shall constitute but one and the same instrument.  Faxed signature pages shall be treated as an original signature.

11.     All parties have participated in the drafting and negotiation of this Agreement. This Agreement shall be deemed to have been drafted by all the parties.

12.     This Agreement shall be governed by and construed pursuant to the laws of the State of Minnesota applicable to contracts made and performed in the State of Minnesota without reference to any conflict or choice of law rules that would otherwise apply. Any suit, action or proceeding arising out of or in connection with this Agreement may only be brought in the Minnesota District Court for Hennepin County, Minnesota, or the United States District Court for the District of Minnesota, and the parties hereto irrevocably submit and consent to the jurisdiction of each such court, and agree that any summons, complaint, writ, judgment or other notice or service or legal process may be sufficiently served upon it in connection with any such suit, action or proceeding, if sent to the last known address of the applicable party.

[signature blocks to be added]

taken together, shall constitute but one and the same instrument. Faxed signature pages shall be treated as an original signature.

11.    All parties have participated in the drafting and negotiation of this Agreement. This Agreement shall be deemed to have been drafted by all the parties.

12.    This Agreement shall be governed by and construed pursuant to the laws of the State of Minnesota applicable to contracts made and performed in the State of Minnesota without reference to any conflict or choice of law rules that would otherwise apply.  Any suit, action or proceeding arising out of or in connection with this Agreement may only be brought in the Minnesota District Court for Hennepin County, Minnesota, or the United States District Court for the District of Minnesota, and the parties hereto irrevocably submit and consent to the jurisdiction of each such court, and agree that any summons, complaint, writ, judgment or other notice or service or legal process may be sufficiently served upon it in connection with any such suit, action or proceeding, if sent to the last known address of the applicable party.

Trakloc:                            Trakloc International, LLC

                                    By:  _____
                                         Albert S. Hill
                                         President


Wiltin:                             Wiltin PTY LTD.

                                    By:  _____
                                         William J. Andrews
                                         Secretary


Pandora:                            Pandora Select Partners, L.P.

                                    By:  _____
                                         NORMAN J. BAER
                                    Its: ATTORNEY - IN - FACT

**EXHIBIT 7**

**ASSET PURCHASE AGREEMENT**

**THIS ASSET PURCHASE AGREEMENT** (the "*Agreement*") is entered into this 13th day of July, 2007 (the "*Effective Date*") by and between Trakloc North America, LLC, a Delaware limited liability company ("*TLNA*"), Tinplate Purchasing Corporation, a New Jersey corporation ("*TPC*" and, together with TLNA, the "*Buyer*"), Trakloc Building Technology Systems, Inc., a Delaware corporation ("*TBTS*") and Pandora Select Partners, L.P., a British Virgin Islands limited partnership ("*Pandora*" and, together with TBTS, the "*Seller*") with reference to the following facts:

**WHEREAS**, this Agreement sets forth the terms and conditions upon which the Buyer will purchase from Seller, and Seller will sell to the Buyer, all of the assets of TBTS and certain assets of Pandora for the consideration provided herein.

**NOW, THEREFORE,** in consideration of the foregoing recitals and the mutual promises hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby agree as follows:

**SECTION 1. PURCHASE AND SALE OF ASSETS**

    1.1    <u>Purchase of Assets.</u>

    (a)    Upon the terms and subject to the conditions contained in this Agreement, at the Closing, TBTS shall sell, assign, transfer and convey to the Buyer, and the Buyer shall purchase, acquire and accept from TBTS, all of TBTS's right, title and interest in and to the following assets (collectively, the "*TBTS Assets*"):

    (i)    the Trakloc Collateral (as defined on Exhibit A hereto);

    (ii)    those certain assets in connection with Southeastern Metals, Inc. ("*SEM*"), including (W) a Settlement Agreement between Pandora, SEM and Gary L. Nelson ("*Nelson*") dated July 18, 2006; (Y) an action commenced in the state court in Sumner County, Tennessee against SEM and Nelson; (Z) Confession of Judgments of SEM and Nelson; (AA) a SAMCO Master Bundler and Stud Machine (the "*Master Bundler and Stud Machine*"); (BB) a Master Lease Agreement between Pandora and SEM dated October 13, 2005 as to the Master Bundler and Stud Machine (the "*Master Lease Agreement*"); and (CC) a Voluntary Surrender Agreement between SEM and Pandora dated January 11, 2007 as to the Master Bundler and Stud Machine (the "*Voluntary Surrender Agreement*").

    (b)    Upon the terms and subject to the conditions contained in this Agreement, at the Closing, Pandora shall sell, assign, transfer and convey to the Buyer, and the Buyer shall purchase, acquire and accept from Pandora, all of Pandora's rights, title and interest in and to (X) the Contingent License and Working Agreement between Trakloc International, LLC, Pandora and WILTIN PTY LIMITED, dated as of July 15, 2006 (the "*Contingent License Agreement*"); (Y) the License Agreement between WILTIN PTY LIMITED and International Fabricated Buildings, Inc., predecessor in interest to Trakloc International, LLC, dated January 30, 2002 (the "*Master License Agreement*") and (Z) the Intellectual Property and Working Agreement between WILTIN PTY LIMITED and International Fabricated Buildings, Inc., predecessor in interest to Trakloc International, LLC, dated January 30, 2002 (the "*IP Working Agreement*" and, together with the Contingent License Agreement and the Master License Agreement, the "*Pandora Assets*").

(c)     The TBTS Assets and the Pandora Assets shall be hereinafter collectively referred to as the *"Purchased Assets."*

1.2     As Is, Where Is. Buyer agrees that it is purchasing and shall take possession of the Purchased Assets in their AS IS, WHERE IS condition and acknowledges that it has previously been given the opportunity to and has conducted such investigations and inspections of the Purchased Assets as it has deemed necessary or appropriate for purposes of this Agreement. Buyer further acknowledges that Seller is making no representations or warranties as to the Purchased Assets, except as otherwise set forth in Section 3 below.

1.3     Purchase Price. The purchase price (the *"Purchase Price"*) to be paid on the Closing Date by the Buyer to the Seller for the Purchased Assets shall be $3,250,000 payable in the manner set forth in Section 2.2(b)(i). The Purchase Price shall be allocated among the Purchased Assets as follows: (i) $1,000,000 shall be allocated to the Pandora Assets; (ii) $750,000 to the Master Bundler and Stud Machine, Master Lease Agreement and the Voluntary Surrender Agreement (the *"Master Bundler Assets"*); and (iii) the remaining $1,500,000 shall be allocated to the Trakloc Collateral. Seller hereby acknowledges receipt of $30,000 from Buyer on each of April 18, 2007 and July 2, 2007, for a total of $60,000, in partial payment of the Purchase Price. Seller further acknowledges receipt of $15,000 on July 2, 2007 as and for partial payment of the amounts due Seller from Buyer as set forth in Section 2.2(b)(iii) below.

1.4     Assumed Liabilities. As a condition to this Agreement, TLNA agrees to accept all payment and performance obligations of Seller, whether now existing or existing after the Closing Date, under the agreements with Intertek, AWCI, ICC, NAHB and any other industry, testing, certification or marketing agreements to which Buyer has agreed in writing prior to Closing (*"Certification Liabilities"*). TLNA further agrees to accept, as a condition to this Agreement, all liabilities and obligations of whatever kind of Seller under the Pandora Assets, any license agreement with a licensee or sublicensee of the Purchased Assets or any other agreement assigned to Buyer in connection herewith (collectively, the *"Contract Liabilities"*), accruing on or after the Closing Date. The Certification Liabilities and the Contract Liabilities are collectively referred to hereinafter as the *"Assumed Liabilities"*.

## SECTION 2. CLOSING, DELIVERY AND PAYMENT

2.1.     Closing. The Closing shall take place at 10:00 a.m. on the Effective Date at the offices of Seller's legal counsel, Messerli & Kramer P.A., in Minneapolis, Minnesota, or at such other time or place or manner as the Seller and Buyer may mutually agree (the *"Closing Date"*).

2.2.     Deliveries. At the Closing, subject to the terms and conditions of this Agreement, the Seller and Buyer will deliver the following:

(a)     Seller's Closing Deliveries.

(i)     Seller shall execute and deliver bills of sale in a form mutually agreed to by the Seller and Buyer.

(ii)     Seller shall execute and deliver the patent assignment, trademark assignment, and those assignment and assumption agreements, all in a form mutually agreed to by the Seller and the Buyer, executed by Seller.

(iii)     Seller shall execute and deliver the Stock Certificate No. 1 of Trakloc International, Inc., along with duly executed stock power.

(iv)     Seller shall deliver resolutions of the Board of Directors or Partners (and stockholders, to the extent applicable) of Seller, authorizing the transactions contemplated hereby.

(v)     Seller shall cause its counsel, Messerli & Kramer P.A., to deliver a legal opinion as to the matters set forth in Sections 3.2 and 3.3 of this Agreement.

(vi)     TBTS shall deliver a certificate of good standing of TBTS in the jurisdiction of its organization.

(vii)     Pandora shall execute and deliver the Security Agreement.

(b)     <u>Buyer's Closing Deliveries.</u>

(i)     As and for payment of the Purchase Price, (X) TLNA shall execute and deliver to Pandora a promissory note in the original principal amount of $1,000,000 in the form of the attached Exhibit B (the "*Note*"); (Y) TPC shall execute and deliver to Pandora a Guaranty Agreement in the form of the attached Exhibit C (the "*Guaranty Agreement*"), guarantying TLNA's obligations under the Note; (Z) TPC shall execute and deliver to Pandora a Security Agreement in the form of the attached Exhibit D (the "*Security Agreement*"), securing TPC's payment obligations under the Guaranty; (AA) Buyer shall deliver $1,790,000, in immediately available funds, by wire transfer, to Seller; and (BB) Buyer shall cause its legal counsel, Mintz & Gold, LLP, to deliver $400,000 in immediately available funds, by wire transfer to Seller, said amount representing earnest money held in escrow by Buyer's legal counsel since April 18, 2007.

(ii)     The Buyer shall pay to Seller $5,000, in immediately available funds, by wire transfer, as and for the remaining amount due and owing Seller from Buyer for its legal fees and expenses incurred in connection with the transactions contemplated by this Agreement, of which Buyer agreed to pay an amount equal to $20,000.

(iii)     The Buyer shall pay to Seller $41,538, in immediately available funds, by wire transfer, as and for reimbursements of amounts paid by Seller prior to Closing to AWCI, Intertek, ICC, and NAHB and other marketing and certification expenses agreed to in writing by Buyer.

(iv)    · The Buyer shall deliver resolutions of the Board of Directors or Board of Managers (and stockholders and members, to the extent applicable) of Buyer, authorizing the transactions contemplated hereby.

(v)     The Buyer shall deliver a certificate of good standing of TPC and certificate of formation of TLNA in their jurisdiction of organization.

(vi)     The Buyer shall execute and deliver those assignment and assumption agreements in the form mutually agreed to by the Buyer and Seller.

(vii)     The Buyer shall execute and deliver the Domain Name Assignment.

**SECTION 3. SELLER'S REPRESENTATIONS AND WARRANTIES**

TBTS and Pandora, severally and not jointly and for themselves and not the other, hereby represent and warrant to the Buyer the following:

3.1    Sole Representations and Warranties of the Seller. EXCEPT AS EXPRESSLY STATED IN THIS AGREEMENT, SELLER DOES NOT MAKE ANY EXPRESS OR IMPLIED REPRESENTATIONS, STATEMENTS, WARRANTIES, OR CONDITIONS OF ANY KIND OR NATURE WHATSOEVER CONCERNING THE PURCHASED ASSETS, INCLUDING (WITHOUT LIMITING THE GENERALITY OF THE FOREGOING) ANY WARRANTIES REGARDING OWNERSHIP, CONDITION, QUANTITY AND/OR QUALITY OF ANY OR ALL OF THE PURCHASED ASSETS AND ANY AND ALL IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

3.2    Organization, Good Standing and Qualification. TBTS is a corporation duly organized, validly existing and in good standing under the laws of the state of Delaware, with full corporate power and authority to own, use, and operate its properties and assets and to conduct its business as such properties are owned, used or operated and as such business is conducted. Pandora is a limited partnership duly organized, validly existing and in good standing under the laws of the British Virgin Islands, with full power and authority to own, use, and operate its properties and assets and to conduct its business as such properties are owned, used or operated and as such business is conducted.

3.3    Authority. TBTS and Pandora have the full right, power and authority to enter into this Agreement and each agreement, document and instrument to be executed and delivered by each of them pursuant to this Agreement and to carry out the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement and each such other agreement, document and instrument by TBTS or Pandora has been duly and validly authorized and approved by all necessary action on TBTS or Pandora's part, as the case may be, and no other action on its part is required in connection therewith. This Agreement and each agreement, document and instrument to be executed and delivered by TBTS or Pandora pursuant to this Agreement constitutes, or when executed and delivered will constitute, the legal, valid and binding obligation of TBTS or Pandora, as the case may be, enforceable in accordance with its respective terms, except to the extent that enforcement is limited by bankruptcy, insolvency, moratorium, conservatorship, receivership or similar laws of general application affecting creditors' rights or by the application by a court of equity principles.

3.4    Material Adverse Change. Since March 8, 2007 and through the Closing Date, TBTS has operated its business consistent with its operations prior to and on March 8, 2007. During that period, there has been no material adverse change in the condition, financial or otherwise, of TBTS' business, operations or the TBTS Assets, except as disclosed on Schedule 3.4 of this Agreement. TBTS MAKES NO REPRESENTATIONS AS TO THE BUSINESS CONDITION OF ANY LICENSEE OF THE PURCHASED ASSETS.

3.5    Encumbrances. Seller will transfer and convey the Purchased Assets free and clear of any mortgage, pledge, lease, lien, charge, security interest, encumbrance or restriction ("*Encumbrances*"), except for the rights of any existing licensee or sublicensee under the Purchased Assets (exclusive of the Master Bundler and Stud Machine).

3.6   <u>Consents/Approvals.</u> No consent or approval of WILTIN PTY LIMITED or any license or sublicensee of the Purchased Assets is required to transfer the Purchased Assets as contemplated by this Agreement.

3.7   <u>Ownership of the Purchased Assets.</u> Seller has good and marketable title to all of the Purchased Assets, free and clear of all Encumbrances, except for the rights of any existing licensee or sublicensee under the Purchased Assets (exclusive of the Master Bundler and Stud Machine).

3.8   <u>Pick up of Trakloc Collateral.</u> Seller agrees to make available for pickup by Buyer during normal business hours at the offices of Whitebox Advisors, LLC the Trakloc Collateral until September 1, 2007.

## SECTION 4.   BUYER'S REPRESENTATIONS, WARRANTIES AND COVENANTS

TLNA and TPC, severally and not jointly and for themselves and not the other, hereby represents and warrants to the Seller as follows:

4.1   <u>Organization, Good Standing and Qualification.</u> TLNA is a limited liability company duly organized and existing and in good standing under the laws of the state of Delaware, with full limited liability power and authority to own, use, and operate its properties and assets and to conduct its business as such properties are owned, used or operated and as such business is conducted. TPC is a corporation, duly organized and existing and in good standing under the laws of the state of New Jersey, with full corporate power and authority to own, use, and operate its properties and assets and to conduct its business as such properties are owned, used or operated and as such business is conducted.

4.2   <u>Authority.</u> TLNA and TPC have the full right, power and authority to enter into this Agreement and each agreement, document and instrument to be executed and delivered by each of them pursuant to this Agreement and to carry out the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement and each such other agreement, document and instrument by TLNA or TPC has been duly and validly authorized and approved by all necessary action on TLNA or TPC's part, as the case may be, and no other action on its part is required in connection therewith. This Agreement and each agreement, document and instrument to be executed and delivered by TLNA or TPC pursuant to this Agreement constitutes, or when executed and delivered will constitute, the legal, valid and binding obligation of TLNA or TPC, as the case may be, enforceable in accordance with its respective terms, except to the extent that enforcement is limited by bankruptcy, insolvency, moratorium, conservatorship, receivership or similar laws of general application affecting creditors' rights or by the application by a court of equity principles.

4.3   <u>Litigation between Pandora, SEM, Nelson and Trakloc International, LLC.; Foreclosure and Sale.</u> Buyer represents that the litigation between Pandora, SEM, Nelson and Trakloc International, LLC (**"*Trakloc*"**) and Pandora's foreclosure and subsequent sale of the TBTS Assets to TBTS has been fully disclosed to Buyer. Buyer represents and warrants that it has previously been given sufficient opportunity to investigate the litigation, foreclosure and sale of the TBTS Assets and has conducted such investigations as it deems necessary and appropriate. Buyer represents and warrants that it is not relying upon any representations made by TBTS, Pandora or any of their officers, directors, consultants, employees, owners, agents, attorneys or affiliates other than the Seller's representations made in this Agreement, and that Buyer is fully satisfied with, and relying solely upon, its own investigation of the litigation, foreclosure and sale.

4.4   <u>TLNA Interests.</u> As of the Closing Date, TLNA has issued membership interests to David Jablow and David Jablow has been designated as the manager of TLNA. Those membership interests

were issued to provide for a member who could designate a manager with authority to execute the documents associated with this transaction on behalf of TLNA. Additionally, TLNA has issued subscription rights to acquire up to 97.5% of the membership units. Except for the foregoing, TLNA has no outstanding options, warrants or other rights to acquire any membership units, or securities convertible or exchangeable for membership units or for securities themselves convertible or exchangeable membership units. On or before September 1, 2007, TLNA shall authorize and issue membership units of TLNA, constituting 2.5% of the outstanding membership units on a fully diluted basis on the issuance date, registered in the name of the Seller or its designees (the "*TLNA Interests*"). TLNA covenants and agrees the TLNA Interests shall have full ratchet and anti-dilution rights, the specific terms of which will be set forth in an Operating Agreement of TLNA to be reasonably satisfactory to Seller or its designees, and approved by all of the members of TLNA no later than September 1, 2007. Seller acknowledges and agrees that the Operating Agreement shall (i) provide other holders of membership interests with rights to receive preferential distributions and returns, (ii) designate David Jablow as the manager of TLNA, (iii) grant to David Jablow, as manager, broad rights with respect to the operations of TLNA and (iv) limit the rights of the members to influence or control the operations of TLNA.

4.5    Financial Statements and Audit Rights. Until the Note is paid in full or Buyer is released from liability under the Note in accordance with Section 5.6 below, TLNA and TPC shall furnish to Seller, within ten days after the end of each month, unaudited balance sheets, statement of operations and statement of cash flows for the month just ended and as of the close of such period for that portion of the then-current fiscal year through the end of such month. Such financial statements shall be certified by an officer of TLNA and TPC, respectively, as being complete, correct and fairly representing TLNA or TPC's financial condition and results of operations as of the date thereof, and prepared in accordance with TLNA and TPC's accounting practices, applied on a consistent basis. Until the Note is paid in full or Buyer is released from liability under the Note in accordance with Section 5.6 below, TPC and TLNA shall make all of their respective books, records, ledgers, work papers, accounts and financial information (the "*Books and Records*") available to Seller during business hours for review and audit by Seller or its designees. Seller shall pay all costs and expenses it incurs in connection with its review or audit of TLNA's or TPC's Books and Records.

4.6    Master License Agreement/Contingent License Agreement/IP Working Agreement. Buyer covenants and agrees that, after the Closing Date, it will comply with all of the terms, provisions and conditions of the Master License Agreement, Contingent License Agreement and IP Working Agreement , including, without limitation, all of its performance obligations thereunder.

4.7    Subordination by TLNA. Buyer represents and warrants that, as of the Closing Date, TPC has not granted to TLNA a security interest in, and TLNA does not have any liens or encumbrances against, any of the Collateral (as defined in the Security Agreement).

## SECTION 5. INDEMNIFICATION

5.1    By Seller. Provided that a Claim (as defined below) did not arise as result of the intentional acts of Buyer or its affiliates, Pandora shall indemnify and defend Buyer, its officers, directors, owners, members, employees, agents and affiliates against any claims raised by a third party, asserting that (i) TBTS or Pandora had no right to transfer the Purchased Assets to Buyer under the Purchase Agreement, or (ii) the Contingent License Agreement  is in default or invalid on the Closing Date; or (iii) the IP Working Agreement is in default or invalid on the Closing Date, or (iv) that the Master License Agreement is in default, invalid or not transferable to Buyer on the Closing Date (collectively, a "*Claim*") under these terms:

(a)    Term of Indemnification. Pandora shall indemnify Buyer (as provided in this Section 5) only if the Claim is commenced by the filing of a lawsuit prior to the July 12, 2009 (the "*Indemnification Term*").

(b)    Amount of Indemnification. At no time, shall the amount of the Indemnification exceed the principal balance owed on the Note as of the date the Claim is commenced except as provided in Section 5.1(e) below.

(c)    Suspension of Payments on the Note.

(i) After written notice to Pandora that a Claim entitling Buyer to indemnification has been commenced by the filing of a lawsuit, Buyer may, after 10 days' written notice to Pandora, suspend payments due under the Note (the "*Suspended Payments*") Such suspension shall not release Buyer from liability to pay under the Note unless and until a court of competent jurisdiction issues an order, ruling or judgment (the "Order") against TBTS or Pandora and/or Buyer as to a Claim. Notwithstanding the foregoing, if such Order is a partial Order in favor of TBTS or Pandora and/or Buyer as to TBTS, Pandora's and/or Buyer's rights under the Pandora Assets, Buyer shall not be released from liability to pay under the Note except as set forth in Section 5.1(f).

(ii)    Except as set forth in Section 5.1(c)(iii) below, upon the issuance of an Order in favor of TBTS, Pandora and/or Buyer (and/or an affiliate of Buyer) as to any Claim, or the execution of a settlement agreement, all payments under the Note shall immediately resume and be due and payable in accordance with the terms of the Note and the Suspended Payments shall be due and payable in two equal installments on or before the 30th day and 60th day following the date of the Order, or, if the Claim is settled, in accordance with the terms of the settlement agreement. Interest will continue to accrue on the Suspended Payments in accordance with the terms of the Note until paid. Failure to make payment within five business days of the date due shall be deemed a default under the Note.

(iii)    Notwithstanding Section 5.1(c)(ii) above, in the event an injunction is issued against Buyer and/or an affiliate of Buyer, and Buyer and/or such affiliate is required to cease production, marketing, distributing or other operations in connection with the Purchased Assets, Buyer may continue to suspend payments under the Note for a period equal to two times the period of time from the commencement of the injunction until the lifting or cessation of the injunction (the "*Injunctive Period*"; also referred to as the "*Suspended Payments*"). By way of clarification only, if the Injunctive Period is for a period for twenty days, then the payments due under the Note shall commence forty days after the end of the Injunctive Period.

The maturity date of the Note shall be extended for a period of time equal to the Injunctive Period. Following the Injunctive Period, all payments under the Note shall immediately resume and be due and payable in accordance with its terms and the Suspended Payments shall be converted to principal and added to the principal amount outstanding under the Note to be due in accordance with it terms. Failure to make any of the foregoing payments within five business days of the date due shall be deemed a default under the Note.

(d)    Defense Counsel. The parties agree that Pandora and/or TBTS may, in its sole discretion, select the attorneys who will defend Buyer against any Claim and Buyer agrees to waive any conflicts of interest that may exist as a result of such counsel's representation.

(e)   <u>Rebate of certain portion of Purchase Price.</u> Within ten (10) business days of the issuance of an Order against TBTS or Pandora and/or Buyer as to any Claim (as defined herein) and in addition to Pandora's release of Buyer from any further payments that would be due under the Note in accordance with 5.1(c)(i), TBTS or Pandora shall pay to Buyer an amount equal to $1,500,000 (the "*Rebate Amount*"), which represents that portion of the Purchase Price paid to TBTS on the Closing ($2,250,000) less the value assigned by the parties to the Master Bundler Assets ($750,000). Except as set forth in Section 5.1(f) below, in the event a court of competent jurisdiction issues a partial Order in favor of TBTS, Pandora and/or Buyer as to any Claim, the Rebate Amount will be reduced dollar for dollar by the amount allocated under Section 1.3 of this Agreement as to the Purchased Assets, which are not adversely affected by such partial Order. For example, in the event that a partial Order entitles Buyer to receive the benefit of Purchased Assets having an allocated value of $1,000,000 (but prohibits Buyer from receiving the benefit of Purchased Assets having an allocated value of $500,000), the Rebate Amount would be reduced by $1,000,000.

(f)   <u>Buyer's Repayment Rights in Connection with Pandora Assets</u>. Notwithstanding anything to the contrary contained in this Section 5.1, if a court of competent jurisdiction issues an Order (but not an order for temporary relief) against TBTS, Pandora and/or Buyer, ordering that Buyer may not use the Pandora Assets, or any of them, or otherwise has no rights to the Pandora Assets, or any of them, Buyer shall be entitled to the full Rebate Amount and shall be released from any further liability to make payments under the Note. Upon payment by Seller of the full Rebate Amount, Buyer shall immediately quit claim and deliver to Seller, or its designees, all of Buyer's rights, title and interest in and to the patents and trademarks identified in sections (b) and (c) of Exhibit A to this Agreement which Buyer is prohibited by an Order from utilizing by assignment in a form mutually agreeable to Buyer and Seller.

(g)   <u>Additional Obligations</u>. Buyer's prior written consent, which shall not be unreasonably withheld, shall be required before Pandora shall enter into any settlement agreement containing performance obligations on the part of TLNA or which affects TLNA's rights in any way. If Pandora shall dissolve or transfer substantially all of its assets to an unrelated third party during the Indemnification Term or at anytime thereafter that Pandora has obligations to indemnify Buyer under this Section 5.1, Pandora shall promptly assign its indemnification obligations to an affiliate or such other entity that is reasonably satisfactory to Buyer, or provide security for Pandora's indemnification obligations in such other form as reasonably satisfactory to Buyer. If Pandora fails to comply with the provisions of Section 5(e), (f) or (g), Pandora shall pay to Buyer, on demand, such further amounts as shall be sufficient to cover the cost and expenses, including, but not limited to, reasonable attorney's fees, incurred by Buyer in collecting any sums due hereunder.

(h)   <u>Limitation of Liability</u>.  Seller's liability to Buyer hereunder (whether pursuant to the indemnification obligations set forth in this Section 5, any other lawsuit or action, or otherwise) shall not exceed $2,500,000 in the aggregate.

5.2   <u>By TLNA.</u> TLNA agrees to indemnify, defend and hold harmless the Seller, its officers, directors, owners, members, employees, agents and affiliates from and against any and all claims, damages, losses, liabilities, judgments and awards, and cost and expenses (including reasonable attorneys' fees), resulting from any action, lawsuit or other proceeding commenced by a third party relating to (a) any and all liabilities and obligations of Buyer of any nature, whether accrued, absolute, contingent or otherwise (including, without limitation, tax liabilities), including the Assumed Liabilities; (b) any use of the Purchased Assets by Buyer after the closing date and the conduct of the business after the Closing Date and (c) any breach or default in performance by Buyer of the terms and conditions of the Contingent License Agreement or Master License Agreement. Notwithstanding the foregoing, TLNA's obligations pursuant to this Section 5.2 shall not exceed $2,000,000 in the aggregate.

**SECTION 6: MISCELLANEOUS**

6.1     Severability; Entire Agreement. If any provision contained herein is held unenforceable, the enforceability of any such provision in every other respect and of the remaining provisions hereof shall not be in any way impaired or affected. This Agreement, including the Exhibits referred to here and any documents and instruments executed in connection with the transactions contemplated by this Agreement, is complete, and all promises, representations, understandings, warranties and agreements with reference to this subject matter hereof, and all inducements to the making of the Agreement relied upon by any of the parties hereto, have been expressed herein.

6.2     Governing Law. This Agreement, including the validity hereof and the rights and obligations of the parties hereunder, shall be construed in accordance with and governed by the laws of the State of Minnesota without regard to principles of conflicts of laws

6.3     Headings. Paragraph headings have been inserted in this Agreement as a matter of convenience for reference only and it is agreed that such paragraph headings are not a part of this Agreement and shall not be used in the interpretation of any provision of this Agreement.

6.4     Benefit of Agreement. Nothing in this Agreement, express or implied, shall give or be construed to give, any person other than the parties hereto, any legal or equitable right, remedy or claim under this Agreement, or under any covenants and provisions of this Agreement, each such covenant and provision being for the sole benefit of the parties hereto.

6.5     Consent to Jurisdiction. Each party agrees that any legal action or proceeding with respect to or arising out of this Agreement (or any document or instrument executed in connection herewith), including any lawsuit with respect to a Claim, may be brought in or removed to the federal or state courts located in Hennepin County, Minnesota. By the execution and delivery of this Agreement, each party accepts, for themselves and in respect of their property, generally and unconditionally the jurisdiction of the aforesaid courts. Each of the parties irrevocably consents to the service of process out of any of the aforementioned courts in any manner permitted by law. Nothing herein shall affect the right of TBTS and/or Pandora to bring legal action or proceedings in any other competent jurisdiction. Each party hereby waives any right to stay or dismiss any action or proceeding under or in connection with this Agreement, brought before the foregoing courts on the basis of *forum non-conveniens.*

6.6     Notices. Any communications, including notices and instructions, between the parties hereto or notices provided herein to be given may be given to the following addresses:

(a)     if to TLNA, at

Trakloc North America, LLC.
798 Freling Huysen Avenue
Newark, NJ 07114
Attention: David Jablow, President
Facsimile: (973) 824-1907

with a copy to:

Mintz & Gold, LLP
470 Park Avenue South
New York, NY 10016

Attention: Steven Gold
Facsimile: (212) 696-1231

(b) if to TPC, at:

Tinplate Purchasing Corporation
798 Freling Huysen Avenue
Newark, NJ 07114
Attention: David Jablow, Vice President
Facsimile: (973) 824-1907

with a copy to:

Mintz & Gold, LLP
470 Park Avenue South
New York, NY 10016
Attention: Steven Gold
Facsimile: (212) 696-1231

(c) if to Seller, in care of:

Whitebox Advisors, LLC
3033 Excelsior Boulevard, Suite 300
Minneapolis, Minnesota 55416
Attention: Jonathan Wood, Chief Financial Officer
Facsimile: (612) 253-6151

with copies to:

Messerli & Kramer P.A.
150 South Fifth Street, Suite 1800
Minneapolis, Minnesota 55402
Attention: Jeffrey C. Robbins, Esq.
Facsimile: (612) 672-3777

Anthony Ostlund & Baer, P.A.
90 South Seventh Street, Suite 3600
Minneapolis, MN 55402
Attention: Cheryl A. Stanton, Esq.
Facsimile: (612) 349-6996

All notices or other communications required or permitted to be given hereunder shall be made in writing and shall be considered given (a) when made by hand delivery, (b) one business day after being deposited with an overnight courier if made by a courier guaranteeing overnight delivery, (c) on the date indicated on the notice of receipt if made by first-class United States mail, with return receipt requested, and (d) upon confirmation if made by telecopier. Any party shall have the right to change its address for notice hereunder to any other location within the continental United States by giving of notice to the other parties in the manner set forth hereinabove.

6.7     Counterparts. This Agreement may be executed in one or more duplicate counterparts and when signed by all of the parties listed below, shall constitute a single binding agreement. Delivery of an executed signature page of this Agreement and any of the other documents referred to in Section 2.2 hereof by facsimile or email transmission shall be as effective as delivery of a manually executed counterpart thereof.

6.8     Further Assurances. Each party agrees to execute and deliver such additional documents and perform such additional acts as may be reasonably necessary or appropriate to effectuate, carry out, and consummate the terms and conditions of this Agreement and the transactions contemplated thereby

6.9     Amendments and Waivers. No amendment, modification, termination or waiver of any provision of this Security Agreement or consent to any departure therefrom shall be effective unless the same shall be in writing and signed by each of the parties hereto. Each amendment, modification, termination or waiver shall be effective only in the specific instance and for the specific purpose for which it was given.

**[REMAINDER OF PAGE INTENTIONALLY BLANK]**

**[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]**

   **IN WITNESS WHEREOF,** the undersigned have hereunto affixed their signatures effective the date first above written.

TRAKLOC BUILDING TECHNOLOGY
SYSTEMS, INC.

By: Andrew J. Redleaf, its Director

PANDORA SELECT PARTNERS, L.P.

By: Andrew J. Redleaf
      Director and Chief Executive Officer
      Whitebox Advisors, LLC, its Managing Member

TRAKLOC NORTH AMERICA, LLC

By: David Jablow, its President

TINPLATE PURCHASING CORPORATION

By: David Jablow, its Vice President

689043.8

689043.12                                    12

**[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]**

**IN WITNESS WHEREOF,** the undersigned have hereunto affixed their signatures effective the date first above written.

TRAKLOC BUILDING TECHNOLOGY
SYSTEMS, INC.

_____

By: Andrew J. Redleaf, its Director

PANDORA SELECT PARTNERS, L.P.

_____

By: Andrew J. Redleaf
    Director and Chief Executive Officer
    Whitebox Advisors, LLC, its Managing Member

TRAKLOC NORTH AMERICA, LLC

_____

By: David Jablow, its President

TINPLATE PURCHASING CORPORATION

_____

By: David Jablow, its Vice President

689043.8

**EXHIBIT A**
**TRAKLOC COLLATERAL**

The Trakloc Collateral includes the following:

(a)     A Trade Show Exhibit Booth and files of TBTS located at the offices of Whitebox Advisors, LLC, 3033 Excelsior Boulevard, Suite 300, Minneapolis, Minnesota, and a warehouse located at Roadway Express, Minneapolis, Minnesota.

(b)     To the best of Seller's actual knowledge,  the following patents:

- U.S. Application Serial No. 11/483,714 filed July 10, 2006 entitled "A Method for Production of Joining Profiles for Structural Members"

- U.S. Application Serial No. 60/780,0899 filed  March 8, 2006, entitled "Fire Rated Wall Structure"

- U.S. Application Serial No. 11/483,791 filed July 10, 2006 entitled "Fire Rated Wall Structure"

- PCT Application  Serial No. PCT/US07/05621 filed March 6, 2007 entitled "Fire Rated Wall Structure"

(c)     To the best of Seller's actual knowledge, the following trademarks:

- U.S. Registration No. 3,117,490 registered July 18, 2006 for the mark TRAKLOC

- Brazilian Application Serial No. 827208251 filed February 28, 2005 for the mark TRAKLOC

- Canadian Registration No. TMA 656,979 registered January 19, 2006 for the mark TRAKLOC

- Mexican Application Serial No. 698550 for the mark TRAKLOC

- U.S. Application Serial No. 78/625,483 filed May 9, 2005 for the mark TRAKLOC (PLUS DESIGN)

- U.S. Application Serial No. 78/854,470 filed April 5, 2006 for the mark ELEVATOR STUD

(d)     The domain name of www.trakloc.com. Based solely upon a Whois search of the domain name, the site is registered with Melbourne IT, Ltd. d/b/a Internet Names Worldwide and such registration expires on June 7, 2008. The web designer is Nicole Roshon of Kleer Works. She can be reached at kleerworks@hotmail.com.

(e)     All license agreements between any licensee and sublicensee of the Trakloc Collateral

    (f)      100,000 shares of stock in Trakloc International, Inc., a California corporation, as evidenced by Certificate No. 1 dated February 2, 2004.

    (g)      all other assets of Trakloc International, LLC acquired by TBTS pursuant to the terms of that certain Asset Purchase Agreement between Pandora and TBTS on March 8, 2007, to the extent they exist and are in the possession of TBTS on the Closing Date.

The Trakloc Collateral specifically excludes that certain real property located 4213 Remington Avenue, 9B, Temecula California and any fixtures, furniture, equipment and improvements attached or otherwise related thereto.

**EXHIBIT B**
**FORM OF PROMISSORY NOTE**

**EXHIBIT C**
**GUARANTY AGREEMENT**

**EXHIBIT D**
**FORM OF SECURITY AGREEMENT**

**SCHEDULE 3.4**
**MATERIAL ADVERSE CHANGES**

Below is a summary of the status of certain matters that may affect the condition of TBTS's business or the TBTS Assets. TBTS has previously disclosed this information to Buyer and its representatives on numerous occasions since April 18, 2007 and provided Buyer with copies of related documents.

1.      <u>Tom Horst, West Coast Distributors and persons affiliated with them.</u>  In or around March 2007, Todd Beasley of Pacific Rollforming, LLC d/b/a Trakloc Pacific ("*Trakloc Pacific*") informed TBTS that West Coast Distributors ("*West Coast*") was selling the Trakloc system and using the Trakloc marks in connection with the sale. On March 22, 2007, TBTS's counsel sent a cease and desist letter to West Coast, demanding that they stop the sale of the Trakloc system and use of the Trakloc mark, among other things, in Las Vegas, Nevada. West Coast responded, by email on April 10, 2007, stating that he had legally purchased the Trakloc system and had the right to resell it; that he hadn't entered into contracts prohibiting him from selling the Trakloc system and that he was not using the Trakloc marks in any of his sales materials or other information. In late May, TBTS' counsel sent another cease and desist letter to West Coast, including in such letter copy of West Coast materials that contained the Trakloc mark and demanding that he stop representing West Coast as an authorized Trakloc dealer. West Coast denied TBTS's claims. TBTS' counsel sent a final demand letter to West Coast on June 8, 2007 to which West Coast has not yet replied. On June 27, 2007, TBTS' counsel received a letter from Trakloc Pacific's counsel in connection with West Coast, to which TBTS' counsel replied on July 5, 2007. Since June 8, 2007, TBTS has been investigating matters in connection with West Coast to determine its next course of action.

2.      <u>Metal Lite, Tom Herron and affiliated person.</u> Metal Lite apparently sells a product that competes with the Trakloc system. In May, Trakloc Pacific informed TBTS that Tom Herron was asserting that the Trakloc system didn't comply with the Clark County (NV) Building Code. Shortly after these initial discussions with Trakloc Pacific, Todd Beasley informed TBTS that the issues with Tom Herron appeared to be resolved. On or around June 28, 2007, TBTS learned from Trakloc Pacific that Tom Herron was again disparaging the Trakloc System to Clark County engineers. One of the persons who spoke with Tom Herron was Doug Evans, an engineer who had worked with Hughes and Co., and TBTS to ensure that the Trakloc system had the appropriate testing. TBTS' legal counsel discussed Tom Herron's comments and related circumstances with Mr. Evans on July 5, 2007 to gather information so that TBTS could determine its next course of action. Additionally, recently Tom Herron has contacted the Commonwealth of Massachusetts Department of Public Safety asserting similar claims as in Nevada. TBTS has been in discussion with SEM concerning this to gather additional information to determine its next course of action. Gary Nelson of SEM has sent a letter to the Department of Public Safety concerning the claims by Mr. Herron.

3.      <u>Mark Bernstein.</u> On May 7, 2007, Mark Bernstein sent Seller an email, proposing to re-acquire the Purchased Assets and threatening to file a lawsuit against Trakloc International and Seller. To date, Seller has not been served with such a lawsuit.

4.      <u>Gary Owen.</u> On June 26, 2007, Gary Owen emailed TBTS, claiming an exclusive license under a Master Area License Agreement to the following territories: New Mexico, Nevada, Arizona and Hawaii. If true, his rights conflict with rights of Trakloc Pacific for specific states in question. TBTS is investigating the basis of Mr. Owen's claim and has reached no conclusion as to its merits at this time.

5.   <u>Todd Beasley/Trakloc Pacific.</u> Given the letter from Trakloc Pacific's counsel identified in No. 1 above, the Tom Herron matter described in No. 2 above and Gary Owen's alleged claims described in No. 4 above, TBTS is concerned that Trakloc Pacific may commence litigation, although, at this time, TBTS has no opinion about the merits of any claim Trakloc Pacific may have. Seller has no indication from Trakloc Pacific that it intends to commence a lawsuit against Seller and, to date, no such lawsuit has been commenced.

6.   <u>Nicole Roshon and Kleer Works.</u> Kleer Works is the web designer for TBTS's website, www.trakloc.com, and is in possession of the source codes, passwords and other information necessary to manage the website. In May, TBTS requested this information from Kleer Works so that it could move the website management to a local company. To date, Kleer Works has not released the source codes, passwords and other information TBTS has requested, despite its repeated requests.

# EXHIBIT 8

## TRADEMARK ASSIGNMENT

THIS ASSIGNMENT is from Trakloc Building Technology Systems, Inc., a Delaware corporation ("*TBTS*"), to Trakloc North America, LLC, a Delaware limited liability company ("*TLNA*"). This Assignment is made pursuant to that certain Asset Purchase Agreement (the "*Agreement*") dated July 13, 2007 by and between TBTS and Pandora Select Partners, L.P. ("*Pandora*"), as Seller, and TLNA and TinPlate Purchasing Corporation ("*TPC*"), as Buyer, with respect to the acquisition of certain assets of TBTS and Pandora, including those registered trademarks identified below and any other registered or unregistered trademarks of Trakloc International, LLC (to the extent they exist) in which TBTS may have some right or interest (the "*Trakloc Trademarks*"):

- U.S. Registration No. 3,117,490 registered July 18, 2006 for the mark TRAKLOC

- Brazilian Application Serial No. 827208251 filed February 28, 2005 for the mark TRAKLOC

- Canadian Registration No. TMA 656,979 registered January 19, 2006 for the mark TRAKLOC

- Mexican Application Serial No. 698550 for the mark TRAKLOC

- U.S. Application Serial No. 78/625,483 filed May 9, 2005 for the mark TRAKLOC (PLUS DESIGN)

- U.S. Application Serial No. 78/854,470 filed April 5, 2006 for the mark ELEVATOR STUD

Capitalized terms used, but not otherwise defined in this Assignment, shall have the meanings ascribed to such terms in the Agreement.

**NOW, THEREFORE,** in consideration of and in exchange for one dollar ($1.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, the TBTS hereby sells, assigns, transfers and sets over onto the TLNA, TBTS's entire right, title and worldwide interest in and to the Trakloc Trademarks, including any applications or registrations therefor which may have issued thereon together with all of the goodwill of the business associated or connected with the use of and symbolized by the Trakloc Trademarks, the right to file any document to maintain any such application or registration, all common law trademark or trade name rights or logos in said Trakloc Trademarks, the right to file applications for registration and other filings worldwide, and the right to sue for past, present and future infringement of the Trakloc Trademarks and registration thereof and retain all damages recovered therefrom. The Trakloc Trademarks are conveyed in their AS-IS, WHERE IS condition, free and clear of any liens or encumbrances, except for the rights of any existing licensee or sublicensee under the Purchased Assets (exclusive of the Master Bundler and Stud Machine), and without any representations and warranties except those set forth in Section 3 of the Agreement. TBTS agrees to execute and deliver such additional documents and perform such additional acts as may be reasonably necessary or appropriate to effectuate, carry out, and consummate the terms and conditions of this Assignment and the transactions contemplated thereby.

689132.4

### [SIGNATURE PAGE OF TRADEMARK ASSIGNMENT]

**IN WITNESS WHEREOF,** TBTS has caused this Assignment to by fully executed at Minneapolis, Minnesota, as of the 13th day of July, 2007.

**TRAKLOC BUILDING TECHNOLOGY SYSTEMS, INC**

By: _____   (signature must be notarized)
     Andrew J. Redleaf
     Director

STATE OF MINNESOTA                )
                                   ) ss.
COUNTY OF HENNEPIN             )

On _13 July 2007_, before me, _Teresa Tierney_, personally appeared Andrew J. Redleaf, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____         (Seal)



TERESA E TIERNEY
Notary Public
Minnesota
My Commission Expires January 31, 2010

2

689132.4

# PATENT ASSIGNMENT

THIS ASSIGNMENT is from Trakloc Building Technology Systems, Inc., a Delaware corporation ("*TBTS*"), to Trakloc North America, LLC, a Delaware limited liability company ("*TLNA*"). This Assignment is made pursuant to that certain Asset Purchase Agreement (the "*Agreement*") dated July 13, 2007 by and between TBTS and Pandora Select Partners, L.P. ("*Pandora*"), as Seller, and TLNA and TinPlate Purchasing Corporation ("*TPC*"), as Buyer, with respect to the acquisition of certain assets of TBTS and Pandora, including those patents identified below and any other patents of Trakloc International, LLC (to the extent they exist) in which TBTS may have some right or interest (the "*Trakloc Patents*"):

- U.S. Application Serial No. 11/483,714 filed July 10, 2006 entitled "A Method for Production of Joining Profiles for Structural Members"

- U.S. Application Serial No. 60/780,0899 filed  March 8, 2006, entitled "Fire Rated Wall Structure"

- U.S. Application Serial No. 11/483,791 filed July 10, 2006 entitled "Fire Rated Wall Structure"

- PCT Application  Serial No. PCT/US07/05621 filed March 6, 2007 entitled "Fire Rated Wall Structure"

Capitalized terms used, but not otherwise defined in this Assignment, shall have the meanings ascribed to such terms in the Agreement.

NOW, THEREFORE, for One Dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, TBTS does hereby sell, assign, transfer and set over unto TLNA, its successors and assigns, Assignor's entire right, title and interest in and to the Trakloc Patents, and all divisionals, renewals, continuations and continuations-in-part thereof, and all reissues and re-examinations thereof, and all applications for letters patent which have previously been or hereafter may be filed in any country or countries foreign to the United States, including the full right to claim any such application the priority benefits of the International Convention for the production of industrial property and other priority conferring treaties, and all letters patents which may be granted in any country or countries foreign to the United States and all extensions, divisions, continuations, continuations-in-part, renewals, and reissues and re-examinations thereof; and Assignor hereby authorizes and requests the Commissioner for Patents and Trademarks of the United States and any official or country or countries foreign to the United States, whose duty it is to issue patents on applications, to issue all letters patents to said TLNA, its successors, legal representatives and assigns, in accordance with the terms of this instrument, together with all claims for damages by reason of any past, present or future infringement thereof, along with the right to sue for and collect the same, and to obtain all other possible remedies for TLNA's own use and enjoyment as fully and completely as the same would have been held by TBTS had this Assignment and sale not been made.  TBTS's entire right, title and interest in the Trakloc Patents shall vest irrevocably in TLNA, and this Assignment shall inure to the benefit of TLNA, its successors, assigns and other legal representatives, and shall be binding upon TBTS and its successors, assigns, and legal representatives. The Trakloc Patents are conveyed in their AS-IS, WHERE IS condition, free and clear of any liens and encumbrances, except for the rights of any existing licensee or sublicensee under the Purchased Assets (exclusive of the Master Bundler and Stud Machine), and without any representations and warranties except those set forth in Section 3 of the Agreement. TBTS agrees to execute and deliver such additional documents and perform such additional acts as may be reasonably necessary or appropriate to effectuate, carry out, and consummate the terms and conditions of this Assignment and the transactions contemplated thereby.

**[SIGNATURE PAGE OF PATENT ASSIGNMENT]**

**IN WITNESS WHEREOF,** TBTS has caused this Assignment to by fully executed at Minneapolis, Minnesota, as of the 13th day of July, 2007.

**TRAKLOC BUILDING TECHNOLOGY SYSTEMS, INC.**

By: _____     (signature must be notarized)
       Andrew J. Redleaf
       Director

STATE OF MINNESOTA                    )
                                                              ) ss.
COUNTY OF HENNEPIN                  )

On _13 July 2007_, before me, _Teresa Tierney_____, personally appeared Andrew J. Redleaf, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____

(Seal)

TERESA E. TIERNEY
Notary Public
Minnesota
My Commission Expires January 31, 2010

689131.5

**EXHIBIT 9**

**From:** Roni Dersovitz [mailto:rdersovitz@legalfunding.com]
**Sent:** Monday, October 01, 2007 4:40 PM
**To:** David Jablow
**Cc:** Marc Bernstein; Geoff Darmody; willjinvent@aapt.net.au
**Subject:**

David,

Just to give you a heads up, Marc, Will, Geoffrey, Michael & myself have now formed a new company which is the exclusive owner of the worldwide rights to Trackloc. Marc & Jeff will be in Las Vegas for the show representing the international rights holder. It would be in everyones best interest, if we temporarily put aside the acrimony that has arisen due to the various lawsuits, so that we can move the product forward w/o alerting potential customers to our bickering. When you return, I'd suggest that we meet so as to avoid your getting embroiled in further litigation since we do not believe you to be a rightful licensee.?

Hope to speak to you soon under more pleasant circumstances.

Thank you,

Roni Dersovitz
RD Legal Funding, LLC
dersovitz@legalfunding.com
www.legalfunding.com
201)568-9007 x 101
Fax: (201)568-9307

0/3/2007